82 N.J. Super. 469 (1964)
198 A.2d 115
CECELIA M. JACKSON, ETC., PLAINTIFF-RESPONDENT,
v.
VELVERAY CORPORATION, ET AL., DEFENDANTS-APPELLANTS.
HARRY WEISS, ET AL., PLAINTIFFS-RESPONDENTS,
v.
VELVERAY CORPORATION, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 2, 1963.
Decided March 4, 1964.
*471 Before Judges CONFORD, FREUND and SULLIVAN.
Mr. William F. Harth argued the cause for appellants (Messrs. McKeown, Harth & Enright, attorneys).
Mr. Alfred A. Burns argued the cause for respondents (Messrs. Nitto & Nitto, attorneys, Mr. Harold M. Nitto of counsel and on the brief).
The opinion of the court was delivered by SULLIVAN, J.A.D.
Defendants, pursuant to leave granted by this court, appeal from an order of the trial court setting aside a jury verdict of no cause for action in favor of defendants and ordering a new trial of the matters in issue.
The respective consolidated actions herein were for wrongful death and personal injuries sustained by paid firemen while fighting a fire in the line of duty. The fire occurred on February 17, 1960, and destroyed a large factory building which was located on the boundary line separating the cities of Passaic and Clifton. Plaintiffs Harry Weiss and Edward B. Nolan were paid firemen of the Passaic Fire Department, who sustained personal injuries while fighting the fire. They brought suit for damages for such injuries. William Jackson, *472 who also was a paid fireman of the Passaic Fire Department, suffered injuries while fighting the fire, from which he subsequently died. His widow, who was appointed general administratrix ad prosequendum of his estate, brought suit for damages for his wrongful death.
The trial of the consolidated actions took about eight days. Plaintiffs called some 23 witnesses and also put in evidence numerous exhibits. Defendants cross-examined a number of plaintiffs' witnesses but did not present any proofs of their own. As heretofore noted, at the conclusion of the case the jury returned a verdict of no cause for action in favor of defendants. Plaintiffs thereupon moved for a new trial, which was granted, the trial court ruling that on an unbiased and fair evaluation of the evidence it did not see how the jury could have reasonably come to its verdict.
The evidence in the case showed that the property in question was a four-story brick building owned by defendant Raywin Realty Co., Inc. As heretofore noted, the building was partly in Passaic and partly in Clifton. Defendant Velveray Corporation (Velveray), which was in the business of textile printing and laminating and plastic printing, was a tenant in said building, occupying the first floor and part of the basement.
On February 17, 1960, at about 8:45 A.M., a fire broke out in an overhead exhaust fan located on the first floor of the building. Employees of Velveray attempted to put the fire out with extinguishers. However, a guard at the Manhattan Rubber plant across the street saw flames and smoke coming out of a first-floor window and had a telephone call made to the Clifton Fire Department. The call was made about 8:55 A.M., and Clifton fire apparatus arrived at the scene shortly thereafter. In the beginning the fire was believed to be minor. However, it soon spread to the upper floors and eventually engulfed the entire building. The Passaic Fire Department was called about 9:35 A.M. Sometime after 10 A.M.  plaintiff Weiss fixed the time at between 10:15 and 10:30 A.M.  a portion of an upper wall of the building blew *473 out or collapsed. Firemen Jackson, Weiss and Nolan were outside the building at the time, in the process of "hooking up" the water tower apparatus which had been pulled up alongside the factory building. Jackson and Nolan, who were working on the ground, were struck by debris from the falling wall. Weiss, who was working on a fire truck, jumped clear of the falling debris but in doing so was injured.
It is charged that fireman Jackson's death, and the injuries sustained by firemen Weiss and Nolan, resulted from their being exposed to an undue risk of injury beyond that inevitably involved in fire fighting, which risk was created by conditions attributable to defendants' negligence. These conditions may be summarized as follows:
(1) Alleged negligence in maintenance and operation of sprinkler system.
(2) Alleged storage and use of inflammables contrary to Clifton ordinance.
(3) Failure to call the fire department.
(4) Failure to have a trained fire brigade among its employees.
(5) Alleged cracks and openings in the flooring of the building.
(6) Poor housekeeping in defendants' plant, all of which contributed to the spread of the fire.
The rationale of plaintiffs' asserted cause of action is that the aforesaid conditions attributable to defendants' negligence caused the fire to spread rapidly and engulf the entire building. The intensity of the fire generated a mass of heat, smoke and gases which, triggered by the introduction of oxygen through ventilation, built up pressure within the building. When the upper wall became unable to withstand the pressure, it was pushed out and collapsed.
Plaintiffs' theory of liability is based upon our Supreme Court's opinion in Krauth v. Geller, 31 N.J. 270 (1960). In that case the court stated that there is virtual unanimity that the owner or occupier of property is not liable to a paid fireman for negligence with respect to the creation of the fire. It *474 also added that there was appreciable authority which would impose liability upon the land occupier for negligence with respect to conditions creating undue risks of injury beyond those inevitably involved in fire fighting (31 N.J., at p. 274). Several out-of-state decisions were referred to in which it was held that a fireman could recover for injuries resulting from risks created by the violation of a statute or ordinance, the condition of the means of access, the storage of a dangerous substance, or from a hidden peril. However, the court noted that where liability was found, the emphasis was not upon culpability with respect to the inception of the fire, but with respect to the other risks of injury. While Krauth does not expressly so state, we understand it to mean that the undue risk rule is to be followed in this State.
In its opinion the Supreme Court also discussed an owner's or occupier's possible liability to a fireman for wanton misconduct. Krauth, supra, 31 N.J., at p. 277. However, we need not consider this basis since, as heretofore noted, plaintiffs herein have based their claim solely upon the theory of undue risk and do not suggest that defendants' actions spell out wanton misconduct.
A fireman who enters upon private property has been frequently said to be a licensee only, to whom no duty is owed except to refrain from acts of wilful and wanton negligence. See Annotation, "Duty and liability of owner or occupant of premises to fireman or policeman coming thereon in discharge of his duty," 86 A.L.R.2d 1205, § 4 (1962). However, the Supreme Court of Illinois has recently held that a fireman was not a mere licensee and could maintain a cause of action against a landowner for failure to exercise reasonable care in the maintenance of his property. Dini v. Naiditch, 20 Ill.2d 406, 170 N.E.2d 881, 86 A.L.R.2d 1184 (Sup. Ct. 1960). Our Supreme Court in Krauth, supra, steers a middle course by holding that the status of a fireman is sui generis, and that in entering on private property he is neither trespasser nor licensee nor invitee as such.
*475 The general rule as to the nonliability of an owner or occupant to a paid fireman for negligence is often stated in terms of nonliability for negligence in creating or starting a fire. Krauth, supra, 31 N.J., at p. 274; 2 Harper & James, Law of Torts, § 27.14, p. 1503 (1956); 65 C.J.S. Negligence § 35, p. 494. However, it seems clear that on principle such rule of nonliability extends not only to negligence in creating or starting the fire but also includes negligence related to the spread of the fire, such as ordinary negligence in housekeeping which tends to promote the spread of a fire after its inception from other causes. Indeed, the two situations are often indistinguishable. Correspondingly, the exception to the foregoing rule, namely, an owner's or occupier's liability for creating undue risks of injury beyond those inevitably involved in fire fighting, applies not only to the start of the fire but also its spread, e.g., cases involving the storage of a dangerous substance.
Plaintiffs, in their brief filed on this appeal, argue that an owner or occupier is also liable for active negligent conduct after he is aware a fire is in progress, which negligent conduct changes the course of events naturally flowing from the fire, thus creating undue risks not otherwise inevitably involved in fire fighting. This contention, however, is but a restatement of the undue risk exception, supra, insofar as it applies to the spread of the fire.
It is important to understand what is meant by "undue risks of injury beyond those inevitably involved in fire fighting." Krauth, supra, 31 N.J., at p. 274. We take the phrase "inevitably involved" to mean "inherent." There are certain risks inherent in fire fighting: smoke, flame, and the like. The collapse of a floor, ceiling or wall of a burning building, without more, is a hazard a fireman must ordinarily anticipate. Undue risk beyond these inherent hazards is something more. It includes hidden perils, such as an open elevator shaft, storage of dangerous substances, and other conditions independent of the fire itself. As the Supreme Court noted in Krauth, supra, 31 N.J., at p. 275, "where liability is *476 found the emphasis is not upon culpability with respect to the inception [and we include the spread] of the fire but rather with respect to the other risks of injury * * *."
An earlier case in this State, Campbell v. The Pure Oil Co., 15 N.J. Misc. 723, 194 A. 873 (Sup. Ct. 1937), stated the principle as follows:
"* * * It is contemplated that a fireman in the performance of his duty shall endeavor to extinguish fires however caused and encounter those risks and hazards which are ordinarily incidental to such an undertaking and which may be reasonably expected to exist in the situation in which he places himself. It does not follow that a fireman must be deemed as a matter of law to have voluntarily assumed all hidden, unknown, and extrahazardous dangers which in the existing conditions would not be reasonably anticipated or foreseen. * * *" (15 N.J. Misc., at p. 727)
We turn to a consideration of plaintiffs' proof. The evidence showed that the building was equipped throughout with an overhead wet sprinkler system which was divided into four sections having separate cut-off valves. In 1959 about 20 feet of the system had been removed from the first floor to permit the installation of a new textile printing machine (machine No. 9). This machine had an asbestos-enclosed dry box over it which extended close to the ceiling. The fire started in an exhaust fan in the vicinity of machine No. 9 and set off a sprinkler head in the area. Employees of Velveray used extinguishers on the fire. After the fire apparently was out, the plant superintendent of Velveray ordered one of the employees to "crack" the sprinkler system valve, the effect of which was to drain the particular springler section. The superintendent also went outside the building and broke the seal on a shut-off valve. Whether this valve controlled the entire sprinkler system or only one section thereof was not made clear. This action was taken to prevent water damage after it was thought the fire was out.
Plaintiffs argue that since the building was equipped with a sprinkler system, defendants were required under R.S. 34:6-14 to maintain the sprinkler in operation during the *477 fire. Even if there was no violation of the statute involved, defendants contend that the shutting off of the sprinkler system was negligent conduct which created a condition of undue risk as defined in the applicable law. Plaintiffs' expert testified that had the sprinkler system been operating, it would have contained the fire and prevented it from spreading to the fourth floor of the building.
We are inclined to the view that the foregoing was some evidence to support plaintiffs' claim. However, at most, the question was for the jury. The jury could have reasonably concluded that the removal of 20 feet of the sprinkler system to permit the installation of machine No. 9 was not a material factor in the spread of the fire since machine No. 9 had an asbestos-lined hot box over it which extended close to the ceiling. Also, the area surrounding machine No. 9 "had" a sprinkler head, as evidenced by the fact that it was set off by the fire. There was evidence that in the beginning the fire appeared to be relatively small and, at one point, was thought to have been put out. It was at that time that the sprinkler system was shut off. A jury could have reasonably found that this was not negligent under the circumstances. Even if negligent, it could have been reasonably determined that no undue risk had been created since the proof showed that the sprinkler system, to the knowledge of the fire department, could have been reactivated without difficulty. In any event, the proofs do not compel the factual conclusion that the firemen were necessarily relying upon the full effectiveness of the sprinkler system in the course of their work. The issue was clearly for the jury.
Plaintiffs next contend that since a substantial part of the factory building was located in Clifton, defendants were subject to the Clifton ordinance respecting the storage and use of explosive chemicals, which ordinance was violated by defendants.
The evidence showed that Velveray used various flammable chemicals in connection with its operations. These chemicals were stored in vaults located in the basement of the building. *478 When needed, the chemicals were removed from the basement in five-gallon safety cans for a period of four to eight hours at most. The basement vaults were located entirely within the Passaic part of the building. The ordinance in question required a permit for the storage and handling of flammable liquids in excess of specified amounts.
Aside from the applicability of the ordinance, we fail to see how the evidence was such that a jury could not have reasonably found that Velveray's handling and storage of these chemicals did not add up to negligence creating an undue risk. Despite the statement of defendants' expert that Velveray's operations were extremely hazardous, there was nothing to show that they were regarded by state or municipal authorities as inherently dangerous. The number of cans of chemicals shown to be out of the storage vaults and on the first floor was small. Some of the witnesses testified to seeing a few containers about the first floor, described as some open and some closed. There was no proof that these cans had anything to do with the origin or contributed materially to the spread of the fire. The basement vaults and the chemicals stored therein were untouched by the fire. The blowout of the upper wall, hereinafter discussed, was caused by a build-up of pressure within the building, and not by any explosion of chemicals. This happened a considerable time after the fire had started and after it had spread to the upper stories of the building.
Plaintiffs' expert testified that the cans of chemicals on the first floor contributed to the spread of the fire. He attributed the explosions heard by several of the witnesses to these cans. Assuming this to be the fact, the jury could have reasonably concluded from the evidence that these chemicals, normally used in textile printing and laminating and plastic printing, were not present on the first floor in such quantities and under such circumstances as to constitute a condition of negligence creating an undue risk of injury. Cf. Campbell v. The Pure Oil Co., 15 N.J. Misc. 723, 726, 194 A. 873 (Sup. Ct. 1937). In respect of all of the foregoing, moreover, it *479 was still fairly for the jury to decide whether, if the chemicals caused or contributed to the spread of the fire, this was not a risk inherent in fire fighting in a building housing a business of this type.
Plaintiffs also charge that the failure on the part of defendants to call the fire department permitted the fire to gain headway and thereby created undue risk. When the fire began at about 8:45 A.M., Velveray employees used fire extinguishers on the fire. Initially the fire was thought to be minor, and at one point was believed to have been put out. The fire department was not summoned until 8:55 A.M., by a person across the street who saw flames and smoke coming out a window. When the fire department arrived at the scene the fire "wasn't too much." "As a matter of fact, many people didn't even know there was a fire in progress." Absent an extreme case, not here present, this simply is not a type of situation within the undue risk doctrine. The law on this subject is not concerned with how the fire began or spread before the firemen arrived, but rather whether, after they arrived and undertook to fight the fire, they were subjected to risks not inevitable or inherent in fighting the fire of that kind and extent. On the evidence in this case, this particular issue should not have been submitted to the jury.
In a similar vein, plaintiffs assert that the fire spread rapidly because of Velveray's failure to have a trained fire brigade among its employees. The proof showed that there were no organized fire brigades among Velveray employees, although some instruction had been given in the handling of fire extinguishers. There were foam and dust-type extinguishers available, as well as a "big extinguisher" which was rolled to the area of the fire. These facts are irrelevant. Firemen do not rely on the lessening of their hazard by the work of employee fire brigades.
Plaintiffs also contend that the spread of the fire was aided by cracks and openings in the flooring of the building and poor housekeeping in the Velveray plant. There was testimony of openings or spaces between floors and adjacent *480 walls. However, this proof was so general, sparse and indefinite as to lack any real substance. Based upon this evidence, plaintiffs' expert expressed the opinion that these openings allowed flammable dust and lint to accumulate and the fire to spread vertically into other areas. This testimony just does not have the stature of credible evidence. In any event, conditions like these are within the inherent or inevitable risks involved in fire fighting.
As to dust and lint, the evidence did show that Velveray's operations generated dust and lint which tended to collect on the machines and fans and in and about the plant. However, it was shown that the men who worked on the machines had the job of cleaning them. Also, there were regular porters in the plant to clean the floor.
It is plaintiffs' contention that poor housekeeping conditions contributed to the rapid spread of the fire. However, as we view this evidence, a jury question of undue risk was not made out since, as stated above, poor housekeeping is a hazard inherent or inevitable in fire fighting. If the proof had demonstrated that the plant was a veritable fire trap, it might be argued that there was a hidden peril which created an undue risk. However, if plaintiffs' contention were legally sound, no property owner or occupier could resist a charge such as is here asserted. Once a fire starts it feeds on anything combustible. It will spread through every opening and space, whether it be door, window, airspace, vent or the like. We conclude that there was no evidence on which this particular claim could properly have been submitted to the jury.
Plaintiffs, in support of their theory of causation, produced as a witness an expert in fires. He made an investigation of the fire about a year after it took place. His opinion was that "defendants' conduct and the conditions under their control relate directly to the cause of the rapid spread of the fire, the explosion, the blowout of the wall and the damage and injuries sustained because of that." Particularizing the reasons for such opinion, he noted: (1) the interruption of the sprinkler system as well as the removal of a portion of *481 such system; (2) fighting the fire without calling the fire department; (3) the housekeeping or repair of the building which allowed spaces for "the flammable lint and dust in this hazardous occupation" to accumulate and allowed the fire to spread vertically into other areas; (4) no vertical fire stops of any kind for the entire area; (5) open containers containing highly dangerous liquid accelerants. It was his opinion that the fire had become so intense that a mass of hot air, smoke and gases, triggered by the introduction of oxygen through ventilation, built up pressure inside the plant which blew out the top wall. He described the explosion as a low-order explosion resulting from a build-up of pressure from hot air, smoke and gases. When the wall became unable to withstand the inside pressure, it was pushed out. The expert's conclusion was that these aforesaid conditions constituted unusual hazards beyond those normally incidental to fires encountered by firemen.
We have heretofore considered the various conditions relied on by the expert witness in reaching his conclusion, except the absence of vertical fire stops. On this point the expert testified that Velveray's operations were extremely hazardous and that there should have been vertical fire stops running the length of the building to contain any fire which might start. The lack of such stops, according to the expert, enabled the fire to spread through the area.
We fail to see how this evidence compelled a finding of the creation of an undue risk. Had Velveray's type of operation been extremely hazardous, we must assume that the state or municipal authorities would have supervised and regulated such operations so as to eliminate fire hazard. Vertical fire stops could have been required if found to be needed. R.S. 34:6-4; R.S. 34:6-23; R.S. 40:48-1. There is no evidence that defendants were in violation of any statute, ordinance or order in this regard. But the critical question again is whether the hazard from the spreading fire, in respect of the missing fire stops, was inherent or inevitable in the work of fire fighting. Firemen commonly encounter risks which are *482 increased by all kinds of shortcomings in the maintenance of buildings from a fire prevention standpoint. At best, the issue on this point was also for the jury.
We next consider the trial court's action in setting aside the jury verdict of no cause for action and granting a new trial. In so doing, the trial court stated that plaintiffs' evidence was uncontradicted, and that in the light of such evidence it did not see how the jury could have reasonably come to the conclusion that defendants had not created an undue risk.
A trial court may in an appropriate situation set aside a jury verdict and grant a new trial. R.R. 4:61-1. The norm to be applied is set forth in Kulbacki v. Sobchinsky, 38 N.J. 435, 445 (1962), as follows:
"What the trial judge must do is canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict  or in the language of Hager, to determine `if the verdict be so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice, or partiality' so that `it cannot serve to support the judgment, * * *.' (7 N.J., at p. 210). If reasonable minds might accept the evidence as adequate to support the jury verdict, it cannot be disturbed by the trial court."
Thus viewed, we conclude the jury verdict should not have been disturbed. At most there were disputed issues as to whether or not the conditions complained of were attributable to negligence on the part of defendants, and if so, whether such conditions singly or in combination created an undue risk of injury within the intent of the rule of the Krauth case, supra. Our canvass of the record leads us to conclude that reasonable minds might accept the evidence as adequate to support the jury verdict. The trial judge should not have disturbed it.
The order setting aside the jury verdict and granting a new trial is reversed, the jury verdict of no cause for action is reinstated, and the matter remanded for entry of judgment in favor of defendants. No costs.