488 A.2d 523

**David FLOWERS**

v.

**STING SECURITY, INC., et al.**

**No. 622, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

March 7, 1985.

Certiorari Granted June 28, 1985.

120

Karl G. Feissner, Langley Park, and John B. Walsh, Jr., Rockville, for appellant.

Bernard J. Harig, Rockville (MacLeay, Lynch, Bernhard & Gregg, Rockville, on brief), for appellee, Westinghouse Elec. Corp.

Robert L. Ferguson, Jr., Baltimore (Allen, Thieblot & Alexander, Baltimore, on brief), for appellees, Sting Sec., Inc. and Larry W. Cline.

Argued before MOYLAN, WEANT and GARRITY, JJ.

MOYLAN, Judge.

In the course of fighting a fire at the Rock Creek Terrace Apartments in Rockville on October 28, 1981, the appellant, David Flowers, a volunteer firefighter with the Kensington Volunteer Fire Department, fell 12 stories down an open elevator shaft. As a result of the fall, he suffered serious permanent injuries. On October 14, 1983, appellant filed suit, seeking recovery against ten different defendants, three of whom are appellees on this appeal.

The appellees before us are Sting Security, Inc. (Sting), a service which provided security at the apartment building; Larry W. Cline, an employee of Sting, who was sued in his individual capacity; and Westinghouse Electric Corporation (Westinghouse), the manufacturer of the elevator at the apartment building.

Westinghouse demurred to appellant's pleading. A hearing was held on January 27, 1984, at which the demurrer was sustained with leave to amend. An amended declaration concerning Westinghouse was filed by the appellant on February 21, 1984. On January 26, 1984, appellees Sting and Cline demurred to the original pleading and a hearing

was scheduled for April 4, 1984. In response to the amended declaration of appellant, Westinghouse filed a second demurrer on March 12, 1984, and this matter was also set for the April 4 hearing. At that hearing, presided over by Judge Perry G. Bowen, Jr. in the Circuit Court for Prince George's County, both demurrers were sustained without leave to amend based upon the court's application of the "Fireman's Rule." In sustaining the demurrer as to Sting and Cline, Judge Bowen reasoned:

"The Court: And the basis for the claim is that these persons negligently performed their duties to the owner, so that persons or—persons or persons unknown were able to start a fire on the premises or set a fire, or may have set a fire.

Once again, we think—we have some difficulty with that under any theory of law, but clearly, it falls precisely within the Fire Fighter's Rule. Fires are what firemen are called to confront, and whether they're negligently set, intentionally set or acts of God does not make any difference. A fire is a fire. To say that someone had a duty to prevent the fire from occurring, and therefore, the fireman is entitled to claim directly against them, we think doesn't fit into any pattern of law that we're familiar with, and in any event, falls squarely within the Rule. We, therefore, sustain the demurrer of these defendants without leave to amend."

Judge Bowen also applied the Fireman's Rule in sustaining the demurrer of Westinghouse. From these rulings, appellant brings this appeal.

The appellant attacks the lower court's application of the Fireman's Rule on essentially three grounds. He claims 1) that the Fireman's Rule should not have been applied at all based upon the factual allegations and legal theories of recovery presented; 2) that the Fireman's Rule should not have been applied because it violates appellant's rights under the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights; and 3) that the Fireman's Rule and use of the

invitee, licensee, and trespasser distinction should be abolished and a general negligence standard of reasonable care should be applied.

That first contention—the main thrust of the appellant's argument on this appeal—is, in turn, broken down into distinct sub-issues: 1) that the appellant was an invitee or a licensee by inviation and not a bare licensee upon the burning premises; 2) that Sting and Cline were not the landowners and were not, therefore, eligible for the limitation upon their liability created by the Fireman's Rule; 3) that a count against Sting and Cline based upon a theory of strict liability rather than upon ordinary negligence would be exempt from the Fireman's Rule in any event; and 4) that the claims against Westinghouse would in no event be affected by the Fireman's Rule.

Some initial inquiry is called for into the Fireman's Rule itself.

## The Fireman's Rule

In view of a significant line of precedential authority, there is little difficulty in reaching a decision in this case by applying the Fireman's Rule. The far more difficult task is to articulate a theoretically sound rationale for the decision. That, in turn, requires a probing for the deeper legal principles, and therefore undergirding social purposes, behind the Fireman's Rule.

The prevailing Rule itself, as it limits the tort liability of landowners or others toward a fireman (or policeman) actually engaged in fighting a fire (or apprehending a criminal), is a practical rule in search of an adequate theory. It is an area of law that is in ferment, not so much in terms of the decisions being reached but in terms of the explanations being provided for those decisions. What is emerging is that the Fireman's (or Policeman's) Rule [1] appears to be

---

**1.** Although called "the Fireman's Rule," the Rule is without exception applied to policemen as fully as it is to firemen. As expressed by the

predicated upon a cluster of loosely related reasons, no one of which is necessarily sufficient to explain the Rule in all of its manifestations.

Although neither the case law nor the treatises have meticulously isolated the component strands,[2] an *emerging* [3] rationale based upon assumption of risk is discernibly interwoven with the older rationale based upon the status of the visiting fireman upon the property. Closely related with the assumption of risk analysis is the notion that especially hazardous governmental functions, such as firefighting and policing, are the collective responsibility of society as a whole and are not functions relegated to dependence upon ordinary tort recovery.

A traditional and somewhat simplistic statement of the Fireman's Rule would run essentially as follows: a fireman

---

Supreme Court of California in *Walters v. Sloan,* 142 Cal.Rptr. 152, 571 P.2d 609, 610–611 (1977), "While denominated the fireman's rule, the rule is applicable to policemen as well." The Supreme Court of Nevada spoke with similar effect in *Steelman v. Lind,* 97 Nev. 425, 634 P.2d 666, 667 n. 2 (1981), " 'Fireman's Rule' as used in this opinion includes both feminine and masculine genders and is applied to bar certain tort causes of action by firemen and policemen injured during the course of their hazardous occupations.... While denominated the 'fireman's rule,' it is applicable to policemen as well." (citation omitted). The Supreme Court of Iowa in *Pottebaum v. Hinds,* 347 N.W.2d 642, 643 (1984), thoroughly analyzed "the long, solid history of the fireman's rule, the near universal recognition by courts of this common law doctrine, [and] its application to policemen." Maryland, indeed, in *Sherman v. Suburban Trust Co.,* 282 Md. 238, 384 A.2d 76 (1978), unequivocally treats firemen and policemen as fitting under the same rule of law. When throughout this opinion, therefore, we refer to the Fireman's Rule, there is to be no doubt that it refers as fully to policemen as it does to firemen.

**2.** *Walters v. Sloan, supra* note 1, at 571 P.2d 612, does not even believe a closely reasoned doctrinal parsing to be necessary: "It is unnecessary to attempt to separate the legal theories or to catalog their limitations."

**3.** The newer rationale, based predominantly if not exclusively on assumption of risk, is still in the process of "emerging" *in Maryland,* that is. As will be more fully discussed hereafter, the newer rationale appears clearly to have fully emerged in other parts of the country that have considered the Fireman's Rule within the last decade.

may not recover from private parties for injuries sustained in the course of carrying out his professional duties, but is limited to statutory remedies such as workmen's compensation. *Aravanis v. Eisenberg,* 237 Md. 242, 206 A.2d 148 (1965). Fireman have generally been accorded the status of licensees when entering property to extinguish a fire. *Steinwedel v. Hilbert,* 149 Md. 121, 131 A. 44 (1925); *Aravanis, supra; Sherman v. Suburban Trust Co.,* 282 Md. 238, 384 A.2d 76 (1978). The common explanation for this classification is because "they [firemen] are likely to enter at unforeseeable times, upon unusual parts of the premises, and under circumstances of emergency, where care in preparing for the visit cannot be expected and a duty to make the premises reasonably safe for them at all times would constitute a severe burden." *Sherman, supra,* at 282 Md. 243, 384 A.2d 76. As licensees, firemen are owed the duty by the owners and occupants of the property "of abstaining from wilful or wanton misconduct or entrapment, ... [which] encompass[es] a duty to warn of any hidden dangers, where there [is] knowledge of such danger and an opportunity to give warning." *Id.*

There is nothing wrong with that statement of law except that it is too limited an explanation of a potentially broader legal phenomenon. Depending exclusively upon the status of the fireman as a visitor upon the property, it explains only the rights of the fireman *vis-à-vis* the property owners or others responsible for the maintenance and upkeep of the property.[4] All of the earlier Maryland cases applying the

---

**4.** The Supreme Court of Iowa commented upon the unduly limiting nature of basing the Fireman's Rule on the earlier rationale which looked only to "the differing duties owed by a landowner or occupier to individuals coming on his land." *Pottebaum v. Hinds, supra* note 1, at 347 N.W.2d 644. They observed, at 347 N.W.2d 645:

"We have backed away from conclusively basing a land possessor's duty of care on the status of the injured party.... [B]asing the fireman's rule on the status of the injured party would seem to unfairly limit the rule's application to the landowner/occupant context, thus denying liability for negligent acts of these individuals

Fireman's Rule have dealt with a fireman suing the property owners themselves; an explanation of the Rule based upon the status of the fireman upon the property was, therefore, adequate to explain those decisions.

### The Status of the Fireman Upon the Property

Even this limited instance of a potentially broader rule, however, was not free of semantic difficulty. The fireman was deemed by the earlier cases to be merely a licensee upon the property; the later cases recognized that his status could change, geographically or chronologically, into that of an invitee. Literally, of course, he was neither a licensee nor an invitee but was rather sometimes "like a licensee" and at other times even "like an invitee." The treatise writers have explored the analogy and have generally concluded that the fireman (or policeman) is in a status *sui generis*, not identical with that of a licensee (or sometimes invitee) but rather analogous to them.

The fireman (or policeman) is not literally either an invitee or a licensee, of course, because he has not received, and does not need, an invitation from the owner or the consent of the owner to enter upon the land. He is there, rather, under governmental authority to serve a public purpose. He is frequently analogized to a licensee, and sometimes even said to be a licensee, because his bundle of rights *vis-à-vis* the landowner most closely resembles that of a licensee. This troubled problem of categorizing cleanly the status of a public employee who comes upon the land pursuant to a legal privilege not emanating from the landowner was commented upon by W. Prosser, *Handbook of the Law of Torts* § 61 (4th ed. 1971), at 395–396:

"The courts have encountered considerable difficulty in dealing with those who come upon the land in the exercise of a privilege not conferred by the consent of the occupier.... [T]hese have consisted for the most part of public

---

but not for others whose negligent acts injure police officers or firemen elsewhere." (citation omitted).

officers and employees, who enter in the performance of their public duties. Such individuals do not fit very well into any of the arbitrary categories which the law has established for the classification of visitors. They are not trespassers, since they are privileged to come. The privilege is independent of any permission, consent or license of the occupier, and they would be privileged to enter, and would insist upon doing so, even if he made active objection.... [S]ome writers, particularly in England, have advocated an additional and separate category for them. Thus far, however, the American courts always have proceeded to cram them, with some straining at the seams, into the sack of either licensees or invitees."

In 2 F. Harper & F. James, *The Law of Torts* (1956), § 27.14, "Persons entering premises as of right," at 1501, the authors refer to this linguistic problem as they point out that policemen and firemen "are generally treated as licensees" even if they are not in fact licensees:

"Policemen and firemen, on the other hand, are generally treated as licensees and not as invitees, even if the occupier has summoned them to protect himself or his property. These officers owe a duty to the public to apprehend criminals or extinguish fires; the right to enter private property is a part of that duty, and does not depend on the private summons. Indeed, if the conditions for the exercise of the public duty exist, the occupier would not be privileged to exclude the officer. Quite properly, therefore, courts have found no invitation. But they have classified these officers as licensees, and while it may be a tolerable figure of speech to refer to a license-in-law, there is no more actual consent in these cases than there is invitation. And when there is, the occasional consent like the occasional invitation is legally insignificant. Even if there were good reason to construct a class of visitors on the basis of the occupier's consent, therefore, there would be no better conceptual reason than a poor figure of speech for putting policemen and firemen into that class."

■ In terms of determining that limited degree of care owed by the landowner to the fireman or the policeman, the degree of care owed by the landowner to a licensee provides the appropriate model. The very practical reasons for placing the fireman or policeman in this category were spelled out by Prosser, *supra*, at 397–398:

> "The one really valid basis for the distinction must lie in the fact that firemen and policemen are likely to enter at unforeseeable times, upon unusual parts of the premises, and under circumstances of emergency, where care in looking after the premises, and in preparation for the visit, cannot reasonably be looked for. A man who climbs in through a basement window in search of a fire or a thief cannot expect any assurance that he will not find a bulldog in the cellar."

Harper & James, *supra*, at 1501–1502, stresses the same practical reasons for limiting the liability of the landowner *vis-à-vis* the fireman or the policeman:

> "There are, however, other reasons besides the concepts of consent and invitation that may point to limited liability in these cases. One that the courts have stressed is the infrequency of visits by policemen and firemen, and the unpredictability of the time and place of their visit. A duty to make all the premises reasonably safe for them all the time would therefore be a severe burden."

■ This earlier rationale—based upon the limited liability of the occupier of the land *vis-à-vis* the fireman—provides a sufficient base for affirming Judge Bowen in his sustaining of the demurrer of Sting and Cline, certainly with respect to the negligence counts. That they were not literally the owners or the occupiers of the land is immaterial. They were the agents of the landowners and were responsible for an aspect of the maintenance of the property, to wit, the providing of security. The negligence claims against them allege that they failed to provide proper security for the building, which could have prevented the fire, and were negligently responsible for the start of the

fire itself. They will be treated, for limited purposes of determining the applicability of the Fireman's Rule, as being in the shoes of the occupier of the land.

We turn then to the status of the fireman upon the property. The progenitor case in Maryland of *Steinwedel v. Hilbert, supra,* bears a strong factual similarity to the case *sub judice.* There, as here, a fireman (literally, a member of a fire salvage corps but treated, for tort purposes, as the functional equivalent of a fireman) was seriously injured by falling into an elevator shaft left open and unguarded. The holding of the Court of Appeals, based upon the fireman's status as a mere licensee, was unequivocal, at 149 Md. 123–124, 131 A.2d 44:

> "[T]he general rule of common law is that a fireman entering premises to put out fire is a licensee only, and not an invitee, and that the owner or occupant of the premises is not under any duty of care to keep his premises prepared and safe for a fireman.... 'He must take the property as he finds it, and is entitled only not to be led into danger, "something like fraud." ' " (citations omitted).

*Steinwedel* recognized implicitly what *Aravanis v. Eisenberg, supra,* later recognized explicitly: "[T]hat there may be a change of status, 'geographical or chronological,'" from "licensee to invitee." 237 Md. at 253, 206 A.2d 148. Both *Steinwedel* and *Aravanis* referred, in this regard, to the *Restatement (Second) of Torts* and the early landmark case of *Meiers v. Fred Koch Brewery,* 229 N.Y. 10, 127 N.E. 491 (1920), which indicated that a fireman might be in the enhanced status of an invitee if "he was injured upon a part of the premises open for public use." *Id.,* [237 Md.] at 253, 206 A.2d 148. *Steinwedel* distinguished *Meiers v. Fred Koch Brewery* by pointing out that that "decision is carefully limited ... to liability to persons rightfully using approaches prepared and left open for access to the property." 149 Md. at 124, 131 A.2d 44.

**130**

In the *Meiers* case, the fireman fell into an open coal hole at night while traversing a passageway, kept open for the public by night as well as by day, on his way to fight a fire in a barn that lay well beyond the public, but perilous, passageway. In distinguishing its situation from that in the *Meiers* case, the *Steinwedel* Court pointed out, at 149 Md. 125, 131 A.2d 44:

> "In this present case there is no allegation that the elevator shaft was opened in or near a way prepared and set apart as a passage way, and the case is not rested upon any such concealment or deceptive appearance, 'something like fraud,' put in the path of the plaintiff, as would render the danger a trap. We are to decide, now, only whether upon common law principles the owners or the tenant could be held liable to the injured firemen, or salvage corps man, for failing to exercise care to protect him from falling into an elevator shaft anywhere on the premises, while he is at work putting out a fire."

This geographic change of status from licensee to invitee did not take place under the facts of this case. The common area on the 12th floor of this residential apartment building, where the fire was being fought and where the appellant fell into the open elevator shaft, was an area, to be sure, ordinarily "open for public use." At the critical time herein pertinent, however, it was the site of a raging conflagration. The appellant was in that precise place at that precise time for the limited and exclusive purpose of fighting a fire.[5] This was not, within the contemplation of this geographic change of status law, an area through which the fireman was passing, in transit, on his way to fight a fire in some other part of the building. The chronological change of status, dealt with at great length in *Aravanis v. Eisenberg, supra,* is not remotely applicable

5. When the fire alarm sounded, all of the tenants of the apartment building were required to leave the premises.

here. The injury in this case occurred while the appellant was actively engaged in fighting the fire itself.[6]

■ Any distinction, moreover, between a part of the building held open to the public and a part of the building not held open to the public is immaterial to the claim brought by the appellant, not against the building owner and not against Westinghouse, but against Sting and Cline. Their alleged negligence was in not providing proper security for the building generally, thereby enhancing the possibility that the fire itself would be set. The claim was not based upon their negligent maintenance or lack of maintenance of the building in any physical respect. The appellant, rather, based his claim against them upon the fact that there had been a series of suspicious fires at the apartment complex in recent months. He claimed that in light of those suspicious blazes, the appellees Sting and Cline had a duty 1) to take further steps to reduce the possibility of another fire, 2) to take fire prevention measures that would reduce the spread of fires that might possibly be set,[7] or 3) to provide a warning to all occupants, guests, or other entrants into the building, including firemen, of the potential fire hazard. (It does seem redundant to warn a fireman entering a burning building that there is a potential fire hazard. Could he, thus alerted, forsake his duty?)

---

**6.** Even if, *arguendo,* the appellant were deemed an invitee rather than a licensee, it would make no difference in this case. As *Aravanis v. Eisenberg* fully discussed, the only duty owed to a fireman, even in his enhanced status as an invitee, would be to warn the fireman of any "danger greater than that which is normally found in a private dwelling house" if "the defendant was aware of [the danger] and the plaintiff was not." 237 Md. at 255, 206 A.2d 148. There is no indication that these conditions are remotely pertinent to the situation between the appellant, on the one hand, and Sting and Cline, on the other.

**7.** Arguing strongly against this subcontention is *Thompson v. Warehouse Corporation of America,* 337 So.2d 572, 573 (La.App.1976), wherein it was held that the negligent maintenance of a sprinkler system, which negligence resulted in a fire burning more fiercely and with denser smoke and otherwise more dangerously, is not a breach of duty toward firefighters.

### *Negligently Causing a Fire Not a Cause of Action By a Firefighter*

■ Quite aside from the status of the appellant on the property and quite aside from whether the claim is based upon negligence or upon strict liability, there is a fundamental flaw in the suit brought by the appellant against Sting and Cline. They are charged by him not with having negligently created a hazard which he encountered in the course of fighting the fire, but rather with having negligently caused the fire itself. This is simply not a cause of action that may be brought by a fireman.

Although, to be sure, *Aravanis v. Eisenberg, supra,* was a case where the defendant was the landowner himself, the language of Judge Oppenheimer, at 237 Md. 250–251, 206 A.2d 148, seems unmistakably to carry a broader import:

> "When a fire department is called to fight a blaze, the cause of the blaze is immaterial. It may be the result of actual negligence on the part of the property owner, such as the dropping of a lighted match, or of his negligence in the maintenance of his property, as in permitting a known defective condition of the wiring to remain uncorrected. In either case, if the fireman is injured by the flames or gases of the conflagration, apart from unusual factors operative after the fire has begun, he can not recover. Fighting the fire, however caused, is his occupation. Compensation for injuries sustained in the fulfilment of his duties, absent other circumstances, is the obligation of society."

The national case law, with the same thrust as *Aravanis v. Eisenberg,* is clearly not limited to suits against landowners. *Grable v. Varela,* 115 Ariz. 222, 564 P.2d 911 (1977), did not involve a suit against a landowner but against another who had negligently caused the fire. The holding of the case was clear, at 564 P.2d 912:

> "The 'fireman's rule' which we here discuss negates liability to a fireman by one whose negligence causes or contributes to the fire which in turn causes the death or

injury of the fireman. Other jurisdictions are almost unanimous in denying recovery by an injured fireman from one whose sole connection with the injury is that his negligence caused the fire."

The Supreme Court of California announced a similar holding in *Lipson v. Superior Court of Orange County,* 31 Cal.3d 362, 182 Cal.Rptr. 629, 644 P.2d 822, 831 (1982):

"Where the defendant's only act was to cause the fire in which the fireman was injured, it is immaterial whether the defendant's act was negligent or ultrahazardous."

In *Steelman v. Lind,* 97 Nev. 425, 634 P.2d 666, 668 (1981), the Supreme Court of Nevada rendered a similar holding:

"Whether the negligently created risk which results in a fireman's or policeman's injury is the reason for his being at the scene in his professional capacity determines the applicability of the rule."

*Solgaard v. Guy F. Atkinson Co.,* 6 Cal.3d 361, 99 Cal. Rptr. 29, 33, 491 P.2d 821, 825 (1971), held that "firemen cannot complain of negligence in the creation of the very occasion for [their] engagement." *See also Giorgi v. Pacific Gas & Electric Company,* 266 Cal.App.2d 355, 359, 72 Cal.Rptr. 119 (1968), where a fireman was not permitted to maintain a suit for negligence against a company whose allegedly negligent maintenance of electrical poles and wires had caused the fires in question.

### The Assumption of Risk Rationale

■ Judge Bowen's sustaining of the demurrer by Westinghouse (and arguably his sustaining of the demurrer by Sting and Cline with respect to the strict liability count) presents a problem that cannot be handled by the older rationale that simply limits the duty of care owed by a property owner to a licensee.[8] As more modern tort law

---

8. *Armstrong v. Mailand,* 284 N.W.2d 343, 350 (1979), pointed out the broadening and liberating effect of Minnesota's change from "status on the property" to "assumption of risk" as the doctrinal predicate for the Fireman's Rule: "[T]he change in focus facilitates application of

makes overwhelmingly clear, however, the Fireman's Rule by no means rests exclusively, or even predominantly, upon that older rationale. The major modern justification for the Fireman's Rule is based upon the notion of assumption of risk. The movement away from the old dispensation was discussed by *Grable v. Varela, supra,* at 564 P.2d 912:

> "While there is little doubt that the fireman's rule originated in the land occupier cases, the rule is not limited to injuries suffered by firemen on land belonging to or occupied by the defendant."

A leading statement of the newer analysis is contained in *Walters v. Sloan,* 20 Cal.3d 199, 142 Cal.Rptr. 152, 155, 571 P.2d 609, 612 (1977):

> "[T]he fireman's rule is based on a principle as fundamental to our law today as it was centuries ago. The principle is not unique to landowner cases but is applicable to our entire system of justice—one who has knowingly and voluntarily confronted a hazard cannot recover for injuries sustained thereby. We have consistently applied this concept in our recent pronouncements in other cases of basic tort doctrine. These include cases dealing with product liability."

The Supreme Court of Oregon pointed out in *Christensen v. Murphy,* 296 Or. 610, 678 P.2d 1210, 1216 (1984), that, "the rationale of the rule accepted in *Spencer* [*v. B.P. John Furniture Corp.,* 255 Or. 359, 467 P.2d 429 (1970)] was not premises liability, but assumption of risk and policy considerations." It went on, "The rationale for the 'fireman's rule' in Oregon has been 'implied' assumption of risk." *Lipson v. Superior Court of Orange County, supra,* provides a similar analysis, at 644 P.2d 827:

> "The fireman's rule is primarily based on the principle of law denominated assumption of risk. That principle holds that 'one who has knowingly and voluntarily confronted a hazard cannot recover for injuries sustained thereby.'"

---

the fireman's rule to defendants other than owners and possessors of land."

*See also* Note, *Assumption of the Risk and the Fireman's Rule,* 7 Wm. Mitchell L.Rev. 749 (1981); Comment, *Negligence Actions by Police Officers and Firefighters: A Need for a Professional Rescuers Rule,* 66 Cal.L.Rev. 585 (1978).

### *Primary vs. Secondary Assumption of Risk*

Within the context of serving as the primary basis for the Fireman's Rule, the notion of assumption of risk is used in a very special sense. It is necessary to distinguish between a "primary" assumption of risk, which arises out of the special relationship between the firefighter and the public, and a "secondary" assumption of risk, which is an affirmative defense on a case-by-case basis and which closely resembles contributory negligence. The distinction between these conceptually very different varieties of assumption of risk was made clear by Harper & James, *supra,* § 21.1, at 1162:

> "The term assumption of risk has led to no little confusion because it is used to refer to at least two different concepts, which largely overlap, have a common cultural background, and often produce the same legal result. But these concepts are nevertheless quite distinct rules involving slightly different policies and different conditions for their application. (1) *In its primary sense the plaintiff's assumption of a risk is only the counterpart of the defendant's lack of duty to protect the plaintiff from that risk.* In such a case plaintiff may not recover for his injury even though he was quite reasonable in encountering the risk that caused it. Volenti non fit injuria. (2) *A plaintiff may also be said to assume a risk created by defendant's breach of duty towards him, when he deliberately chooses to encounter that risk.* Hereafter *we shall call this 'assumption of risk in a secondary sense.'* " (Footnotes omitted) (Emphasis supplied).

Perhaps the leading statement on the Fireman's Rule generally and on the special sense in which the notion of "assumption of risk" is used specifically, was that by Chief

Justice Joseph Weintraub in *Krauth v. Geller*, 31 N.J. 270, 157 A.2d 129, 130–131 (1960): [9]

> "The rationale for the prevailing rule is sometimes stated in terms of 'assumption of risk,' used doubtless in the so-called 'primary' sense of the term and meaning that the defendant did not breach a duty owed, rather than that the fireman was guilty of contributory fault in responding to his public duty."

The Supreme Court of Oregon was also meticulously careful in analyzing the two senses in which "assumption of risk" may be used, pointing out in *Christensen v. Murphy, supra,* at 678 P.2d 1216:

> "The rationale for the 'fireman's rule' in Oregon has been 'implied' assumption of risk in the 'primary,' as opposed to the 'secondary,' sense of the phrase. This meant that no duty was owed to exercise care to avoid the necessity of the special services of a paid public· safety officer, not that the officer was guilty of contributory fault in responding to his or her duty.... In contrast to 'secondary' assumption of risk, which is a variant of contributory fault, 'primary' is a derivative of 'express' assumption of risk. That is, due to the nature of the parties' relationship, it was implied, despite the lack of any express agreement, that the plaintiff disclaimed or waived the duty of care the defendant might otherwise owe to him or her." (Citation omitted).

A fireman does not assume a risk in the secondary sense, hazard by hazard and fire by fire, and only when he lacks a safer alternative, but in the broad, primary sense as an inherent incident of his occupation.[10] This special

---

**9.** *Krauth v. Geller* was cited with approval by our Court of Appeals in *Aravanis v. Eisenberg,* at 237 Md. 250, 251, 206 A.2d 148.

**10.** There is, of course, both under the older rationale and the newer rationales for the Fireman's Rule, a universally recognized exception to that Rule, not generally discussed throughout this opinion because not pertinent under the facts of this particular case. Where pertinent, however, it is always available as an exception to the application of

attribute of his occupational undertaking was well expressed by *Spencer v. B.P. John Furniture Corp.*, 255 Or. 359, 364–365, 467 P.2d 429, 431 (1970):

"Whatever choice a fireman makes about those dangers to which he will submit himself, such choice is necessarily made at the time he becomes a fireman. When he appears on the scene of a fire and realizes that the owner or possessor has created or permitted a situation which has enhanced the normal risks to be expected in fighting a fire of the kind involved, he does not have the privilege of refusing to fight the fire. He has to fight it anyway. When he becomes a fireman, he does not undertake to fight only ordinarily dangerous fires which have not been started or made more dangerous by someone's lack of care."

---

the Fireman's Rule. The animating principle is that even under the assumption of risk rationale for the Rule, a fireman does not assume *all* risks to which he may be exposed in the course of fighting a fire, but

"assumes *only* those *hazards* which are *known or can reasonably be anticipated* at the site of the fire.... While the fireman's rule shields a defendant from liability for negligently or recklessly causing or for failing to prevent a fire, it does not provide protection to a defendant who commits independent acts of misconduct after the firefighters have arrived on the premises." *Lipson v. Superior Court of Orange County, supra,* at 644 P.2d 828–829. (Emphasis supplied).

Similar language is found in *Aravanis v. Eisenberg, supra,* at 237 Md. 254–255, wherein the Court stated that

"[B]ecause of the nature of his duties, the fireman takes the property as he finds it, subject to the *usual and ordinary hazards* to which firemen are ordinarily exposed.... The possessor of land must exercise reasonable care not to subject the fireman to *unusual danger* and to see that the fireman is aware of any such *unusual danger* of which the landowner has knowledge and the fireman could not reasonably be *expected to discover* in the discharge of his duties.' " (Emphasis supplied).

*And see Prosser and Keeton on the law of Torts* (5th ed. 1984) § 61, "Invitees," at 431:

"Yet the fireman's rule has been held only to apply when the firefighter or police officer is injured from the very danger, created by the defendant's act of negligence, that required his professional assistance and presence at the scene in the first place, and the rule will not shield a defendant from liability for independent acts of misconduct which otherwise cause the injury."

■ In *Armstrong v. Mailand*, 284 N.W.2d 343, 348 (1979), the Supreme Court of Minnesota clearly defined the legal significance of this primary assumption of risk:

> "Primary assumption of the risk is not really an affirmative defense; rather, it indicates that the defendant did not even owe the plaintiff any duty of care."

### The Public Policy Rationale and Equal Protection of the Law

Closely intertwined with the primary assumption of risk rationale, and strongly supporting it, but with an independent content of its own is the public policy rationale. That rationale, in a nutshell, was articulated by *Steelman v. Lind, supra,* at 634 P.2d 667:

> "A public safety officer ... cannot base a tort claim upon damage caused by the very risk that he is paid to encounter and with which he is trained to cope....
>
> Such officers, in accepting the salary and fringe benefits offered for the job, assume all normal risks inherent in the employment as a matter of law and thus may not recover from one who negligently creates such risk." (citations omitted).

As we discuss the public policy basis for the Fireman's Rule, it will be appropriate to bring in at this point the appellant's contention that the Fireman's Rule, as applied in Maryland, violates the appellant's constitutional rights under the Federal Fourteenth Amendment and under Article 24 of the Maryland Declaration of Rights. Although the appellant's argument, on brief, is little more than a bald allegation in this regard, it is nonetheless clear that he is making a claim based upon the Equal Protection Clause of the Fourteenth Amendment. Although Article 24 of the Maryland Declaration of Rights does not contain an express equal protection clause, the concept of equal protection has nonetheless been deemed to be embodied within it. *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 616 n. 4, 458 A.2d 758 (1983). Although, to be sure, we are here dealing with a judicially created legal doctrine and not with

a legislative act, the appellant is claiming, by analogy to that body of constitutional law, that there "is no rational basis to distinguish him [the fireman] from all other citizens." In holding that the Fireman's Rule as applied in Maryland does not offend the Federal or State Constitutions, we will pursue this analogy with him.

Our cases hold that where all persons who are in like circumstances are treated the same under the law, there is no deprivation of equal protection. *State v. Good Samaritan Hospital,* 299 Md. 310, 327, 473 A.2d 892 (1984). The test we apply is the "rational basis standard of review." *Montgomery County v. Fields Road Corp.,* 282 Md. 575, 579–580, 386 A.2d 344 (1978). That standard was definitively set forth for the Supreme Court in *Lindsley v. National Carbonic Gas Company,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911):

"The rules by which this [equal protection] contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify ... but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of the facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest on any reasonable basis, but is essentially arbitrary."

In holding that the Fireman's Rule does "rest on [a] reasonable basis" and is not "essentially arbitrary," we note that the law being attacked "enjoys a strong presumption

of constitutionality and ... a reasonable doubt as to its constitutionality is sufficient to sustain it." *Hornbeck v. Somerset Co. Bd. of Educ., supra,* at 295 Md. 656–657, 458 A.2d 758.

■ The Fireman's Rule, almost universally accepted and nowhere rejected constitutionally, stands for the principle that societal responsibility rather than possible tort recovery is the better, surer, and fairer recourse for a fireman or policeman injured in the line of duty. We cannot say, as the appellant would have us say, that that is not rationally related to a legitimate State interest.

Indeed, *Aravanis v. Eisenberg, supra,* alluded to this public policy, at 237 Md. 251, 206 A.2d 148, "Compensation for injuries sustained in the fulfilment of his duties, absent other circumstances, is the obligation of society." *Aravanis* went on to quote with approval from *Scheurer v. Trustees of Open Bible Church,* 175 Ohio St. 163, 192 N.E.2d 38, 43 (1963):

"The benefit from the performance of the official duties of these public employees is shared by all citizens of the community and the burden of loss caused by injury should be shared by all citizens of the community through taxes."

The most forceful statement of the public policy rationale for the Fireman's Rule was probably that of Chief Justice Weintraub in *Krauth v. Geller, supra,* at 31 N.J. 273–274, 157 A.2d 130–131:

"[I]t is the fireman's business to deal with that very hazard and hence, perhaps by analogy to the contractor engaged as an expert to remedy dangerous situations, he cannot complain of negligence in the creation of the very occasion for his engagement. In terms of duty, it may be said that there is none owed the fireman to exercise care so as not to require the services for which he is trained and paid. Probably most fires are attributable to negligence, and in the final analysis the policy decision is that it would be too burdensome to charge all who carelessly cause or fail to prevent fires with the injury suffered by

the expert retained with the public funds to deal with those inevitable, although negligently created, occurrences. Hence, for that risk, the fireman should receive appropriate compensation from the public he serves, both in pay which reflects the hazard and in workmen's compensation benefits for the consequences of the inherent risks of the calling."

The Supreme Court of Iowa in *Pottebaum v. Hinds, supra*, at 347 N.W.2d 643, based its Fireman's Rule predominantly on grounds of public policy:

"While the term 'fireman's rule' is used generically, this common law doctrine, in actuality, is a product of various legal theories resulting in several different rules. We determine public policy supports adoption of a narrow rule denying recovery to a firefighter and policeman whenever their injuries are caused by the very wrong that initially required the presence of an officer in his official capacity and subjected him to harm."

The Supreme Court of California, in *Walters v. Sloan, supra*, observed that its Fireman's Rule "is premised on sound public policy and is in accord—if not compelled by—modern tort liability principles," 571 P.2d at 611, and went on to point out with respect to the undergirding public policy, at 571 P.2d 612:

"A second reason underlying the fireman's rule does not have a significant historical background, but rather is a modern one of public policy, adopted by progressive courts and based on fundamental concepts of justice. As succinctly stated in *Solgaard v. Guy F. Atkinson Co.*, [6 Cal.3d 361, 99 Cal.Rptr. 29, 491 P.2d 821 (1971)], *supra*, ... firemen ' "cannot complain of negligence in the creation of the very occasion for [their] engagement." ' ...

. . . . .

California is not insensitive to its obligation to compensate public safety officers for hazards faced or for injuries received. Firemen and policemen are paid for the work they perform including preparation for facing the hazards of their professions and dealing with perils when

they arise. When injury occurs liberal compensation is provided." (citations omitted).[11]

■ The Fireman's Rule, as judicially applied in Maryland, does not offend the equal protection guarantee of either the Federal Fourteenth Amendment or Article 24 of the Maryland Declaration of Rights. This additional rationale for the Fireman's Rule, moreover, just as with the closely allied assumption of risk rationale, liberates the Rule from any limited application only to the owners or occupiers of the property on which the injury occurs.

### The Fireman's Rule and Strict Liability, etc.

■ The appellant argues strenuously that the Fireman's Rule, based exclusively upon the fireman's status as a licensee, is a limitation only upon claims of negligence brought against the occupier of the land. He argues that the existing Maryland case law on the subject of the Fireman's Rule would have no bearing on his claims that sound in strict liability, breach of warranty, fraud, negligent misrepresentation, and statutory liability. If his premise were correct, his conclusion might well be valid. As our preceding discussion has made clear, however, modern tort law generally and Maryland, now at least, specifically, predicates the Fireman's Rule far more upon the rationales of assumption of risk and public policy than on the earlier, but now retreating, rationale of status upon the property. Under these modern rationales, the Fireman's Rule cuts a broad swathe through tort claims, regardless of their nature.

■ The appellant's claim against Westinghouse for strict product liability maintains that Westinghouse, in its

---

**11.** We note that our Legislature has specifically provided for disability and death benefits for both full-time and volunteer firemen at various places in our Annotated Code. *See, e.g.,* Article 38A, §§ 42–45; Article 41, § 59A–1; Article 101, §§ 64A, 34. Additionally, *see Bd. of Co. Comm'rs. v. Colgan,* 274 Md. 193, 201–208, 334 A.2d 89, 94–97 (1975), for an excellent discussion sustaining special legislative provisions for disability benefits paid to firemen based upon the hazardous nature of their occupations.

manufacture of both the elevator and the elevator door, produced a defective product that would not withstand the heat of the fire. With respect to it, the observation from *Jackson v. Velveray Corp.*, 82 N.J.Super. 469, 475, 198 A.2d 115 (1964), quoted with approval in *Aravanis v. Eisenberg*, at 237 Md. 252 n. 2, 206 A.2d 148, is highly appropriate:

"There are certain risks inherent in fire fighting: smoke, flame, and the like. The collapse of a floor, ceiling or wall of a burning building, without more, is a hazard a fireman must ordinarily anticipate."

We believe that the malfunctioning of an elevator in the course of a fire falls into the same category. The anticipation of structural hazards on the part of a fireman precludes bringing a product liability suit against the carpenter whose stairway collapsed, the architect whose wall caved in, or the plasterer whose ceiling fell, in the course of a raging conflagration. All of these are among the risks assumed as an occupational duty.[12]

In terms of the legal applicability of the Fireman's Rule to such suits, the Supreme Court of Iowa said in *Pottebaum v. Hinds, supra,* at 347 N.W.2d 647:

"The question now becomes whether a rule barring recovery for negligent acts which create the occasion for an officer's engagement should be applied to a strict liability action brought under our dram shop act. Generally, courts have held that the fireman's rule is applicable to all causes of action, regardless of the particular nature of an action."

In *Lipson v. Superior Court of Orange County, supra,* the same reasoning prevailed, at 644 P.2d 831:

"Firefighters are trained and compensated to fight fires caused by the maintenance of an ultrahazardous activity as well as fires that result from negligent causes. Thus,

---

**12.** Unless, of course, the hazard is not the product of the fire but pre-existed the conflagration and, therefore, could be deemed a hidden or unanticipated risk. *Armstrong v. Mailand, supra. And see* note 10, *supra.*

this court holds that the fireman's rule bars recovery on a theory of strict liability where the fireman sustains injuries as a proximate result of the same ultrahazardous activity that causes the fire." (footnote omitted).

■■■ Probably the leading case on the impact of the Fireman's Rule upon suits based upon strict liability and product liability is *Armstrong v. Mailand, supra.* The Minnesota Supreme Court explained why the assumption of risk defeats a strict liability claim as surely as it does a negligence claim, at 284 N.W.2d 352:

> "[T]he public policies underlying the theories of strict liability are not so strong as to remove the plaintiff's conduct from the court's consideration when assessing liability. In conformity with these decisions, we hold that a plaintiff may, implicitly or expressly, manifest his consent to relieve the defendant of his duty under the theories of strict liability, and, therefore, the doctrine of primary assumption of the risk may be utilized in actions based on strict products liability and strict liability for an abnormally dangerous activity."

The conclusion of that court was sure:

> "Even assuming the firemen can otherwise establish the elements of negligence per se, strict products liability, or strict liability for an abnormally dangerous activity, recovery on the basis of these theories is not available unless the injury was caused by a hidden or unanticipated risk."

*Id. See also Pritchard v. Liggett & Myers Tobacco Co.,* 350 F.2d 479, 485 (3d Cir.1965) (primary assumption of risk is available in actions for products liability based on breach of warranty), *modified on other grounds,* 370 F.2d 95 (3d Cir.1966), *cert. denied,* 382 U.S. 987, 86 S.Ct. 549, 15 L.Ed.2d 475 (1966).

### *The Abolition of the Licensee-Invitee-Trespasser Distinction*

The appellant finally urges that Maryland abolish the antiquated, and much criticized, distinction among licensees,

invitees, and trespassers. Precisely the same request was made to the Court of Appeals in *Sherman v. Suburban Trust Co., supra,* and they declined to grant it on the ground that the issue had not been preserved for appellate review. Precisely the same request was made to us in *Woodward v. Newstein,* 37 Md.App. 285, 302, 377 A.2d 535 (1977), and we pointed out that the question "is not for this Court, but rather, the Court of Appeals, to decide."

■ In view of the fact that the Fireman's Rule is not predicated primarily on the invitee-licensee distinction but rather upon the assumption of risk and public policy, the change the appellant seeks would yield him naught. This very question was before the Minnesota Supreme Court in *Armstrong v. Mailand, supra,* where it commented, at 284 N.W. 350:

> "[W]e conclude that firemen are not classified as licensees, invitees, or *sui generis.* Rather, they are owed the same duty of care as all entrants, *except to the extent they assume the risk in a primary sense.*" (emphasis supplied).

JUDGMENTS AFFIRMED;

COSTS TO BE PAID BY APPELLANT.