## BULL STEAMSHIP LINES *v.* FISHER, Use of Himself and GLOBE INDEMNITY CO.

[No. 44, October Term, 1950.]

*Decided December 8, 1950.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Michael P. Crocker* and *Frank T. Gray,* with whom were *Jessie Slingluff, Jr.* and *Marbury, Miller & Evans* on the brief, for appellant.

*Isidor Roman* and *Daniel E. Klein,* with whom was *W. Giles Parker* on the brief, for appellee.

MARBURY, C. J., delivered the opinion of the Court.

Appellee sued appellant on his own behalf and on that of his employer's workmen's compensation carrier for injuries sustained while he was upon a quay of the Baltimore harbor as a ship's carpenter, the injuries resulting from the swinging of a load of lumber attached to a ship's boom operated by an employee of the appellant. Appellant's motion for a directed verdict was denied by the lower court, and, after a verdict against it, its motion for judgment N.O.V. was likewise denied. The questions raised are whether there was sufficient evidence of primary negligence, whether appellee was guilty of contributory negligence as a matter of law, whether the evidence showed that the appellee had voluntarily assumed the risk which caused his injuries, as a matter of law, whether the trial court failed to instruct the jury on the doctrine of voluntary assumption of risk, and whether the trial court erred in refusing to instruct the jury that the evidence showed that the appellant had no last clear chance to avoid the injuries.

The accident happened on a 900 foot pier which projects into the south side of the Baltimore harbor. Along

the easternmost part of the length of that pier, and immediately adjacent to the side of the ships which load there, there extended an open apron 12 to 13 feet wide. This apron was of rough planking and carried a railroad track. To the west of the apron was a large two-story warehouse. On August 7th, 1947, between 8 and 9 A.M., the steamship *Half Knot* lay parallel to and along the east side of the pier taking on cargo. Shortly after 8 A.M., four ship ceiling carpenters, one of whom was the appellee, all experienced waterfront workers, arrived pursuant to a contract between their employer, the Oriole Ship Ceiling Company and the appellant, to load some rough lumber aboard the ship as a necessary part of their job of shoring and securing a deck cargo of pilings. They found two batches of 4x6 dunnage had to be put aboard and they requested the stevedores, employees of the appellant, to operate two winches at hatch No. 3 for the hoisting. These carpenters then loaded on the land end of the pier a ton of these boards upon a small truck or dolly and pushed it to a position in the center of the 12 to 13 foot apron adjacent to hatch No. 3 of the ship. The load was not placed directly under the boom which was to hoist it aboard, and therefore the hook attched to the boom by a cable, when it was fastened to the load was out of plumb from the boom block by a horizontal distance variously estimated from 3 to 10 feet. The hook and lumber and dolly were thus nearer to the land end of the dock than the boom block. Fisher was experienced in the operation in question, and had many times hoisted lumber aboard ships in this manner. The group of carpenters put two straps or slings around the lumber and attached the boom hook to them. When this was done, Fisher and one of the workmen were in the 5 to 6 foot space between the lumber and the warehouse, while the other two men were on the opposite side. After finishing, they all moved away from the load. The other three men stepped backward while Fisher went four or five steps, or feet, toward the shed or warehouse. Fisher said he figured the load would swing some but not exactly

the way it did. The leader of the carpenters was supposed to give the signal to the winchman, but there is some conflict in testimony as to whether any signal was given at this particular time. The load, however, was ready for lifting and the winchman lifted it. It went up three or four feet, swung toward Fisher and struck him at chest level as he stood against the jamb of one of the warehouse doors.

There were two booms connected with the load and there was some testimony that there was a housefall attached to the top of the shed, but this last testimony was practically disregarded as being incorrect. There was, however, another cable attached to the offshore boom, and, in the course of the operation when the load cleared the ship, this offshore boom pulled it around to the particular point where it was to be lowered and discharged. There was testimony that the front wheels of the dolly had been caught in the railroad track, and that when the winchman took a strain on the inshore boom cable, this caused the load to pivot on the dolly wheels, and to take the direction it did, thereby striking the appellee. The appellee contends that the proper method would have been to tighten the cable of the offshore boom and to lift the load slowly, in which case it would not have swung out, but would have kept along the line of the ship until it reached the point where it was to be raised to deck level and carried over the side of the ship. The failure of the winchman to take this precaution, and the latter's action in lifting suddenly and causing the load to swing in an unexpected direction is the negligence charged against appellant. The testimony is conflicting, and in view of what we have just related, we think there was sufficient evidence to submit to the jury the question of primary negligence.

The next two questions involve the appellee, namely, whether he was guilty of negligence directly contributing to the accident, and whether he assumed the risk of such an accident. The appellant contends that the facts are so strongly against the appellee on both doctrines that

it was entitled to instructions against the appellee on both as a matter of law. Before we comment upon the facts with respect to these contentions, it is advisable to differentiate between them.

It is not necessary for us, of course, to discuss what is negligence of a plaintiff directly contributing to an accident. That has been before this court and all other courts so many times that it is well known what it means. It consists of some act of negligence on the part of the plaintiff which, whether great or small, directly contributes to the happening of the accident, and, under our decisions, if it plainly appears that some negligence of the plaintiff did so contribute, the defendant is entitled to a verdict. Assumption of risk has a different basis and affects not the negligence of the plaintiff, but the degree of care which the defendant has to exercise under the circumstances. It is thus stated by Prosser on Torts, Paragraph 51 page 377: "In its primary and proper sense, it means that the plaintiff has consented to relieve the defendant of an obligation of conduct toward him, and to take his chance of injury from a known risk. It refers to the situation in which the plaintiff, with full knowledge of the risk, voluntarily enters into some relation with the defendant involving danger to himself through the defendant's conduct. He makes the choice at his own risk, and is taken to consent that the defendant shall be relieved of responsibility. The legal position is then that the defendant is under no duty to protect the plaintiff. It is not a question of any negligence on the part of the plaintiff, who may be acting quite reasonably, and it is immaterial whether he has exercised proper caution."

The distinction between contributory negligence and assumption of risk is thus stated by Harper on Torts, Paragraph 130, page 290: "Contributory negligence does not relieve the defendant from his duty of due care toward the plaintiff; it merely disentitles the latter from recovering damages by reason of his own fault. Voluntary assumption of risk presupposes negligence on

the part of neither defendant nor plaintiff. Contributory negligence, of course, implies negligence on the part of both. A plaintiff who has voluntarily assumed a risk cannot recover because the defendant has not been negligent. A plaintiff who has been guilty of contributory negligence can not recover by reason of his own wrongful conduct."

In the case of *Warner v. Markoe*, 171 Md. 351, 359-360, 189 A. 260, 264, this court, speaking through Chief Judge Bond, said: "The distinction between contributory negligence and voluntary assumption of risk is often difficult to draw in concrete cases, and under the law of this state usually without importance, but it may be well to keep it in mind. Contributory negligence, of course, means negligence which contributes to cause a particular accident which occurs, while assumption of risk of accident means voluntary incurring that of an accident which may not occur, and which the persons assuming the risk may be careful to avoid after starting. Contributory negligence defeats recovery because it is a proximate cause of the accident which happens, but assumption of the risk defeats recovery because it is a previous abandonment of the right to complain if an accident occurs. *Volenti non fit injuria.*" See also *Gordon v. Maryland State Fair*, 174 Md. 466, 199 A. 519; *LeVonas v. Acme Paper Board Co.*, 184 Md. 16, 40 A. 2d 43.

The contributory negligence of the defendant which the appellant claims occurred in this case was in not moving the way the other carpenters went, but in going in the opposite direction in which he knew the load was going to swing. In view of the testimony that the load did not have to swing as it did, but that it could and should have been controlled by the cable of the offshore boom, and that the appellee had no reason to suppose that the winchman was going to raise the load rapidly without tightening this cable, and could not anticipate that such action would cause the dolly to pivot and swing over to where he was, rather than go parallel to the ship to the place where it was to be loaded, we are

unable to say there is no other conclusion which a reasonable man could draw, except that the appellee was guilty of contributory negligence.

The appellant's theory on assumption of risk is that the appellee was thoroughly familiar with the nature of the operation, that he took the chance of the risks incident to it, that the winchman was thereby relieved from any duty toward him, and therefore the court should find that the entire risk of the accident had been voluntarily assumed by the appellant and so instruct the jury as a matter of law. The answer to this question depends largely upon what risk the appellee assumed and as to this, we find a wide divergence of opinion in the hundreds of cases which have passed upon this question. Assumption of risk before the passage of workmen's compensation acts was one of the common forms of defensive action in damage cases, although of late years, it has not been so prevalent. We find, however, that every risk is not necessarily assumed by one who works in a dangerous place or at a dangerous occupation. He assumes only those risks which might reasonably be expected to exist, and, if by some action of the defendant, an unusual danger arises, that is not so assumed. Where there is a dispute whether the risk is assumed or not, that question is usually left to the jury.

In the case of *Hilton Quarries Inc. v. Hall*, 161 Md. 518, 158 A. 19, 21, in which the opinion was written by Chief Judge Bond, a truck driver was struck by a box of crushed stone swung from a derrick in a quarry as the stone was being loaded into the truck. The plaintiff was standing on the top of his driving cab when he was struck, and he claimed it was necessary under the circumstances for him to stand there. Ordinarily, the derrick operator would stop the stone, but in this case, it continued to swing contrary to expectations, knocked the plaintiff off the truck on a fender, then continued to drop and fell on him. It was agreed by all the witnesses that the stone fell out of control for some distance and there were several conflicting causes of the

excessive swing and fall of the stone. The derrick man thought that he must have checked the fall too suddenly by the use of a foot brake and caused a rebound sufficient to shake or loosen the checking "dog" which is between the teeth of the ratchet on the drum, and thus permit the line to run out and drop the stone. The defendant offered a prayer of assumption of risk because it said the plaintiff took up a dangerous position, but the court declined to grant this prayer, saying: "He might be held bound to anticipate and so to assume dangers from operation in ordinary course, yet not to anticipate and assume the risk of rare casualties such as the derrick operator has described in this case". The issue in that case was left to the jury. We think the case before us has many aspects similar to that case, and that the issue of what risk was assumed by the appellee was properly left to the jury.

A more disturbing question is raised by the appellant's exception to the charge of the court which failed to mention assumption of risk. The appellant had offered a prayer on the question which was refused. It is not necessary for us to consider the correctness of that prayer, or of its form, because the question was again and properly raised by appellant in its exception to the failure of the court to include any mention of the question in its oral charge. It was unquestionably the right of the appellant to have that issue submitted to the jury, and the point before us is whether, although the trial judge did not mention the term "assumption of risk", or describe it, he did so discuss the question in his charge as to enable the jury to pass upon it in connection with the defense of contributory negligence. While assumption of risk and contributory negligence, as we have shown, are not the same, nevertheless they may arise from the same fact, and, in a given case, a discussion of one may necessarily include the other. In the Hilton Quarries case, supra, the court said: "* * * the truck driver, in taking the position, might be held to have assumed all the apparent dangers of operation in ordinary

course, but could not be held to have anticipated casual negligence during the operation, in the absence at least of warning and orders from the quarryman against taking the position." In the previous part of the opinion, the court said that the defense of assumption of risk and of contributory negligence in that case both referred to the effect of the driver's taking a position on the top of the cab, and were two aspects of the same contention. In the case before us, the appellee, according to the contention of the appellant, assumed the risk of the unusual swinging of the dolly because he was familiar with the general operation. The court instructed the jury as follows: "Now, at the outset, you should consider the fact that Mr. Fisher has been working on and around the waterfront for a considerable period of time, that he was not a stranger to the operation of loading a ship; that he had certainly seen how loads will swing and be swung; also taking into consideration the fact that he had been pushing along with his fellow-employees the dolly, and the dolly got caught in the track and they proceeded to go ahead anyhow, instead of getting the dolly out of the track and directly under the fall they hooked it up when it was four or five feet away from what would be the direct line, and where it was obvious the draft was bound to swing; then you are entitled to take into consideration the fact whether Mr. Fisher, not being a stranger to the operation of ships and booms or the hoisting and lowering of cargo, took proper precautions for his own safety."

This statement clearly brought to the attention of the jury the question how much of the risk of the operation Mr. Fisher assumed. While it was followed by a statement that if the jury felt there was anything he failed to do for his own safety at the time the load was left, they could find he was guilty of contributory negligence and not entitled to recover, it seems to us that the jury had before it sufficient information to permit it to pass upon the fact that the appellee, with his knowledge of the operation, was not in the position of a stranger to it,

but would be held to some accountability by reason of this knowledge. Under such circumstances, if the jury felt that the appellee knew the load might swing in his direction, it does not matter much for the purposes of this case, and for the purposes of having the jury correctly pass upon the facts, whether it was said that he assumed this risk, or whether it is said that he was guilty of contributory negligence in not going in another direction. The jury could scarcely fail to understand that if they thought he should have anticipated what happened, then he could not recover no matter what legal terms were used in describing the situation. The purpose of oral charges is to tell the jury in simple words what the law is in a case before them, and we will not be too particular in criticising the words used if the result is sufficient. We have reached the conclusion in the present case that the jury had the question raised sufficiently presented to it by the court's charge.

The appellant also asked the court to instruct the jury as a matter of law that the doctrine of last clear chance did not enter into the case. This requested charge was negative in its nature and presented the unusual situation of a defendant attempting to take out of the case an issue which had not been injected into it by the plaintiff. The doctrine of last clear chance is one relied upon by a plaintiff, and unless it is present, which it does not seem to have been in this case, there is no occasion for the court to mention it. We think the instruction was correctly refused.

As we find no error, the judgment will be affirmed.

*Judgment affirmed with costs.*