730 A.2d 742

**Lee James CREWS**

v.

**John HOLLENBACH, Sr., et al.**

**No. 1129, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

June 2, 1999.

Erik D. Frye, Greenbelt, for appellant.

Robert L. Ferguson, Jr., and Ann D. Ware (Ferguson, Schetelich & Heffernan, P.A., on the brief, for appellee, Excalibur Cable), Baltimore (Peter J. McNamara and McNamara & Fizer, on the brief, for appellees, Hollenbach and Honcho & Sons), Baltimore (Thomas J. Davis and Thomas J. Davis & Associates, on the brief, for appellees, Maryland Cable, et al), Rockville (Norton C. Joerg and McBreen, McBreen & Kopko, on the brief, for appellee, Byers Engineering), Upper Marlboro, for appellees.

Argued before DAVIS, HOLLANDER and THIEME, JJ.

HOLLANDER, Judge.

This appeal arises from a gas explosion in Bowie, Maryland on March 23, 1996, which severely injured Lee James Crews, appellant, an employee of Washington Gas Company.[1] As a result of the occurrence, appellant filed a twenty-count complaint on August 1, 1997, in the Circuit Court for Prince George's County, against various defendants, who are appel-

---

1. We believe the correct name of this entity is "Washington Gas Light Company." But, because the parties have repeatedly referred to the company as "Washington Gas Company" or "Washington Gas," we shall do the same.

lees here.[2] They are: John Hollenbach, Sr.; Honcho & Sons, Inc. ("Honcho"); Excalibur Cable Communications, Inc. ("Excalibur"); Maryland Cable Partners L.P. ("Maryland Cable"); and Byers Engineering Company ("Byers").[3]

After a motions hearing, the court determined that appellees were entitled to summary judgment, based on the doctrine of primary assumption of risk. From that ruling, appellant timely noted his appeal. Crews has posed one question for our consideration, which we have rephrased slightly:

Did appellant assume the risk of a gas explosion based on his occupation?

For the reasons that follow, we conclude that appellant is barred from recovery under the doctrine of primary assumption of risk, because his injury was a foreseeable risk of his occupation. Therefore, we shall affirm the trial court's order granting appellees' motions for summary judgment.

---

**2.** At the outset of the litigation, Theresa Crews, appellant's wife, was a co-plaintiff, alleging, *inter alia,* loss of consortium. She is not a party to the appeal, however.

**3.** Appellant initially sued "Maryland Cable, Inc.," not Maryland Cable Partners L.P. An answer was filed by Maryland Cable, stating: "COMES NOW Defendant Maryland Cable Partners LP, incorrectly sued as Maryland Cable, Inc." Nonetheless, the cover of appellees' joint brief lists both "Maryland Cable, Inc." and "Maryland Cable Partners" as appellees. In addition, appellees stated in the text of their brief that "Maryland Cable, Inc. and Maryland Cable Partners allegedly hired Excalibur ... to install the cable lines." At oral argument, we sought to clarify whether these are two distinct entities. Unfortunately, Maryland Cable's counsel was not one of the attorneys who was arguing the appeal for the appellees. Following oral argument, however, Maryland Cable's counsel wrote a letter to this Court, explaining:

[Appellant] ... originally sued Maryland Cable, Inc., a misnomer. An Answer was filed by Maryland Cable Partners L.P., this Defendant's correct name. Thus, there is only one "Maryland Cable" defendant, not two.

We also note a discrepancy concerning the correct name for Byers. In the complaint, appellant sued "Byers Engineering Company." But, in the body of the complaint, Crews sometimes referred to "Byers Engineering, Inc." In its answer and cross-complaint, the corporation indicated that its name is "Byers Engineering Company." Yet, the cover of appellees' joint brief reflects the name of "Byers Engineering, Inc."

### Factual Summary

Maryland Cable retained Excalibur to install cable lines in Bowie, Maryland. Excalibur, in turn, hired Honcho to perform the necessary excavation. Hollenbach was an employee of Honcho. Prior to the excavation, Byers was retained to locate and mark the buried utility lines in the area where the digging was scheduled to occur. *See* Md.Code (1991 Repl. Vol.), Art. 78, § 28A.[4] While Hollenbach was using machinery to dig a hole in the vicinity of 11405 Trillum Lane in Bowie, he struck a natural gas line owned by Washington Gas. Apparently, neither the police nor the fire department was promptly notified about what had happened. Eventually, the fire department was notified of the situation by someone a mile and a half away, who smelled gas. More than two hours after the natural gas line was struck, Washington Gas was also notified of the leak. The incident caused the release of a large volume of natural gas that permeated the ground and necessitated the evacuation of the surrounding neighborhood.

Upon notification of the occurrence, Washington Gas dispatched a crew to the site to dissipate a volatile gas leak. Appellant, a veteran gas man with over twenty years of service, was the foreman of the crew in charge of repairing the leak. Unfortunately, while appellant and his crew were at-

---

4. Effective October 1, 1998, pursuant to Acts 1998, Chapter 8, § 2, the law concerning underground facilities of public service companies was transferred, without substantive change, to Md.Code (1998), Title 12 of the Public Utility Companies Article. Art. 78A, § 28A(b)(3) defined "One-call system" as a "communications network in the State that allows a person to call the telephone number of a one-number utility protection system." Art. 78, § 28A(c)(2)(ii) required owners of underground utilities, such as gas lines, to participate in the "One-call system." The system also required the owners of underground facilities to provide the Public Service Commission with the telephone number of a contact person to whom calls were to be directed concerning proposed excavation. *See* Art. 78, § 28A(c)(2)(i). The law further obligated those intending to excavate to notify the contact person at least 48 hours before the planned excavation. *See* Art. 78 § 28A(e)(1). Once notified, the underground facility owner was obligated to mark the underground facility, as set forth in the statute. *See* Art. 78 § 28A(c)(2). This statutorily imposed system is commonly referred to as the Miss Utility system.

tempting to repair the leak, an explosion occurred, severely injuring appellant.

In his complaint, Crews alleged, *inter alia,* that Hollenbach negligently "shot" a hole through a natural gas line (Count I); Honcho is responsible for the negligent actions of Hollenbach, its employee (Count III); Excalibur negligently hired, selected, and supervised Honcho (Counts V, VI, and VII); Excalibur had the non-delegable duty to lay cable lines in the vicinity of utility lines (Count VIII); Hollenbach, Honcho, Excalibur, and Maryland Cable are strictly liable for injuries caused by the abnormally dangerous activity of digging around public utilities (Counts X and XVI); Maryland Cable is responsible for the negligent actions of its employee-agent, Honcho (Count XI); Maryland Cable negligently selected and supervised Honcho (Counts XII and XIII); Maryland Cable had the non-delegable duty to lay cable lines in the vicinity of utility lines (Count XIV); Byers failed to use due care in marking the utility lines in the vicinity where the digging occurred (Count XVII); and the combined negligence of Hollenbach, Honcho, Excalibur, Maryland Cable, and Byers led to appellant's injuries (Count XIX). Additionally, Byers filed cross-claims against Hollenbach, Honcho, Excalibur, and Maryland Cable; Hollenbach and Honcho filed cross-claims against Byers; and Excalibur filed a cross-claim against Byers. We turn to explore in more detail the events that culminated in appellant's suit.

On November 3, 1997, Excalibur filed a motion to dismiss the complaint, alleging that appellant's claims were barred by the doctrine of primary assumption of risk. Maryland Cable moved for summary judgment on December 19, 1997, adopting Excalibur's legal argument. The court denied Excalibur's motion to dismiss on December 17, 1997, although the order was not docketed until February 6, 1998.

Thereafter, on April 21, 1998, appellant was deposed. He acknowledged that there was a pronounced smell of gas in the area when he arrived at the scene. The following colloquy between Maryland Cable's counsel and appellant is pertinent:

Q: Okay. Now, you told us earlier that there was a heavy smell of gas in the area?

A: At that particular area.

Q: Well, you mean the area that you were working?

A: Yes, yes.

Q: Is there a point that you recognize that gas smell to be so heavy that you know that it's dangerous?

A: *Well, we always are taught that any type of gas leak or odor is always dangerous.*

\* \* \*

*And we understand that.*

Q: So when you smelled that heavy smell of gas that day on this job, you know that—you knew that the atmosphere was dangerous?

A: Well, yeah. *We knew that that area that we was working in could be dangerous.*

Q: Okay. And you knew that that danger included the danger that a fire would start, correct?

A: We were aware that fire will start behind natural gas.

Q: Okay. And you knew that there was that two-inch plastic pipe that had the static electricity problem, correct?

A: That's correct.

Q: And that static electricity problem you knew could cause sparks, correct?

A: No.

Q: No?

A: The only time electric—it cause [sic] sparks when you deal with the pipe itself.

As I stated before, that's why we have to use what they call a spray on the pipe before you put a squeeze on it, because when you squeeze the pipe off, that's when—almost gets shut off, that's when the electronic takes over.

Q: How about if you get into close proximity of the pipe or touch the pipe with the metal bucket of the backhoe?

A: No, it would not.

Q: Are you sure?

A: Well, I never knew it could set off like that.

Q: All right.

A: I'm not saying that it won't, but I never knew it to do that before. But, anything can set it off, gravels [sic] or rocks that hit together, hitting metal. That could set it off.

Q: For instance, the metal bucket of your backhoe stringing a rock as you were digging—

A: That's correct.

Q: —you knew that that could create a spark?

A: We knew that.

Q: And you knew that if the spark occurs, you could have a fire and an explosion, correct?

A: That's correct, but as I said before, that it have to be worked [sic], regardless. You know what I mean? It have to be repaired. [sic]

*It's a chance you have to—that we go through.* Then again, [sic] there's the other exception to the rule, too.

Q: *So you know that there is this risk of fire, correct?*

\* \* \*

A: *That's correct.*

Q: But you also know that part of your job is accepting that risk, correct?

\* \* \*

A: To the circumstance, yes. But on this occasion that it happened, it didn't have to be this way.

Q: What do you mean by that?

A: Because if the person, I'll say, that dug—that did that had moved in the proper procedure their way, I wouldn't

have had to have been there to get into this thing. You know what I mean?

\* \* \*

Q: All right. But once something like that had happened, regardless of the reason, *once damage has occurred to a gas pipe and you're called out there to make the repair as part of your job, you know that there is a risk of fire and you know that it's part of your job to accept that risk, correct?*

\* \* \*

A: *Yes.* I accept that responsibility when we first got hired, but there is a control of gas that we usually deal with. (Emphasis added).

On April 23, 1998, Excalibur filed a "Supplemental Motion to Dismiss or in the Alternative, Motion for Summary Judgment." Attached to its motion was a partial transcript of appellant's deposition, which it contended demonstrated that Crews "accepted the risk of fire and explosion as part of his job." A motions hearing was held on April 24, 1998.[5]

At the hearing, appellant's counsel suggested that the case concerned the issue of primary assumption of risk, in relation

---

5. In his brief, appellant states that the hearing was held on April 27, 1998. Both the docket and the transcript reflect a hearing date of April 24, 1998, however. Curiously, the docket indicates that the April 24, 1998 hearing was set on March 3, 1998 with respect to Excalibur's Motion for Summary Judgment. Yet, as of March 1998, only Maryland Cable had actually moved for summary judgment; Excalibur did not file its "Supplemental Motion to Dismiss or in the Alternative Motion for Summary Judgment" until April 23, 1998. Moreover, only Excalibur and Maryland Cable had ever filed written motions by the time of the April 1998 hearing.

We also observe that, in a sentence in his brief, appellant complains that he did not have 15 days to respond to Excalibur's supplemental motion. Because he has not otherwise addressed this matter, we shall not consider it. *See Health Servs. Cost Review Comm'n. v. Lutheran Hosp.*, 298 Md. 651, 664, 472 A.2d 55 (1984); *Harrison v. Harrison*, 109 Md.App. 652, 679–80, 675 A.2d 1003, *cert. denied*, 343 Md. 564, 683 A.2d 177 (1996); Md. Rule 8–504.

to "whether the policemen and firefighter's rule applies to this case." Crews's attorney explained:

[T]here's two types of assumption of the risk.

There's assumption of the risk in the policemen and firemen's rule, which says ... if I can paraphrase it, that any time a police officer or a firefighter enters on to a premises, that police officer or firefighter can't sue the landlord for—any negligent acts that they've done or anybody associated with the premises, for any negligent act that they've done, even though he injures himself in the course of his duties. Because, as a matter of public policy, we will not allow him to sue.... [H]e's not an invitee. He's not a ... licensee....

So there's this ... broad general rule upon which they are relying ... by analogy, what [appellees are arguing] is that, since a gas man has to go out and fix gas leaks that he is covered by that very broad ... rule which, it's our position, only applies to policemen and firemen.

\* \* \*

What I ... am trying to say is ... this entire issue turns on whether primary assumption of the risk applies or doesn't apply. Because in our view, ... [appellees] have not presented evidence that, in this particular case on this particular time, Mr. Crews voluntarily assumed ... this risk. Certainly, there's inherent risk in any gas leak, and that's part of [appellant's] complaint.

Appellant urged the court not to apply the primary assumption of risk doctrine, because it would amount to an improper extension of the so-called Fireman's Rule. Appellant's counsel explained that appellant, a civilian, primarily provided "general maintenance work to [the gas] lines," and thus the public policy behind the Firemen's Rule was not applicable to him. To the contrary, appellant contended that various provisions in Maryland law evidenced a clear intent to "differentiate between police officers and firefighters and the rest of the world." Further, appellant explained:

In this case we don't have ... a public official performing a duty. We have a private citizen. Who is a gas man. Who's sent by his employer.

The defense is under a statutory obligation in this case to call "Miss Utility" and—I think the Court has heard the commercials probably a thousand times by now, to—because there is an obligation on them to avoid striking utility lines. And—so there's ... an affirmative duty placed on [appellees] to actually perform their job reasonably so they don't create this kind of situation.

\* \* \*

Gas men are not exposed to a risk of explosion all the time like fire and police are exposed to the numerous risks which they take. They are only exposed to risks when somebody messes up ... and damages their line, or, on very rare occasion [sic] I imagine, there's an actual breakdown.

We have special worker's compensation laws which cover and compensate in some ways for the policemen and firemen's inability to recover in tort in cases like this.

Appellant also asked the court to consider the "rescuer doctrine." In his view, "a rescuer can leave a position of safety to go into save the lives and property of others, and we will judge that person not by what a cool ... reasonably prudent person would do ... we will judge that person very leniently, based on the facts and circumstances with which he is presented at the time."

Excalibur's counsel argued that, for the purposes of its motion, it made no difference whether one spoke of primary or secondary assumption of risk. He argued that the undisputed facts showed that, "on March 23, 1996, ... a man with some 20 years experience with the Washington Gas Company ... went out to repair a known gas leak. It was leaking enough for the neighborhood to be evacuated ... [and] in the process of fixing this gas leak an explosion occurred. He was burned. His job was to go out and fix these leaks." Further, Excalibur's counsel said:

The case law indicates in those situations that, because the risk is inherent to the job that [appellant] ... undertook, it does not matter what various causes brought him to this particular location where he had to perform his duties. It simply means that, as long as he encounters the risk as part of his job and is injured because of that risk, he may not proceed.

\* \* \*

The issue, pure and simple, is primary assumption of risk. This man assumed the risk as part of his job. The allegations of the complaint make that abundantly clear. If [we] accept them as true ... this case should be dismissed as a matter of law.

According to Maryland Cable's counsel, dismissal was warranted even under a secondary assumption of risk theory. He said:

Mr. Crews clearly states that he knew the risk ... knew that the atmosphere in the location of the occurrence was dangerous, was heavy with gas, and he proceeded to— knowing that risk, he proceeded to excavate with a front-end loader, and a fire ensued while the location was under Mr. Crew's control. He was the job foreman. He was the senior Washington Gas person on the job at the time. The location was under his control, and the fire started while the location was under his control.

Appellant countered that in neither Excalibur's motion to dismiss, nor in Maryland Cable's motion for summary judgment, which was filed without an affidavit or a deposition transcript, did appellees raise the issue of whether appellant had secondarily assumed the risk. Moreover, appellant's lawyer claimed that Crews's deposition did not provide all the facts necessary to decide the issue of secondary assumption of risk. He pointed to the lack of information concerning appellant's "knowledge about the length of time that the gas pipe had been hit," and whether Crews voluntarily encountered the risk. He also suggested that appellant did not know that

appellees failed promptly to notify the police or fire department about the occurrence. Further, appellant's counsel asserted:

> Now, there's a real difference—and we've got an expert reviewing this—I suggest that there can be a real difference in the level of risk between going to a gas leak which just happened and going to a gas leak which had been pouring gas into the ground ... for over two hours, which is what happened here.
>
> So when you talk about someone ... assuming a risk, they have to know and appreciate the full nature and extent of the risk. Not just that there's an inherent risk in gas.

* * *

> It's intrinsic in the nature of natural gas that there could be an explosion. And, no matter what [appellant] does ... in his expert performance as a gas man who's been doing this for 27 years and has been called on to repair gas leaks before, he certainly is the person who's called out there to make the call ... and do what he's supposed to do. But when you talk about knowing and appreciating the full nature of the risk, that piece of evidence, in and of itself, would—is critical to his knowledge—to his knowledge of the ... risk.

In the court's view, appellant was "a fellow who is really in the business of remedying gas leaks," who should not be characterized as an "ordinary citizen." Rather, appellant was a "troubleshooter for the gas company." Indeed, the court characterized appellant as "the Red Adair of the gas leak." Accordingly, the court rejected appellant's arguments, reasoning:

> [T]he central issue is whether or not the plaintiff in this case, Mr. James Crews, who worked for Washington Gas Company for some 20 years, assumed the risk of checking into a gas leak that had been reported to his company.
>
> He was an expert gas pipe repair technician, and he was sent to the property where the gas leak had occurred for

the specific purpose of inspecting and addressing the problem. That was his job. That he knew what he was doing and appreciated the risks associated with doing his job is clear in this case. And that he specifically assumed the risk of his job is also clear, and I think that's a matter, not for the jury to decide, but for the Court to decide.

Accordingly, I see no issue with respect to Mr. Crews going to this jury.

\* \* \*

And so, I'm constrained to . . . give judgment . . . against the plaintiff—in favor of the defendants who raised this motion for summary judgment.

Nevertheless, the judge declined to state whether he was specifically applying the Fireman's Rule, explaining that his "opinion speaks for itself."

Appellant's counsel noted that only Excalibur and Maryland Cable had moved for summary judgment.[6] Appellant's counsel said: "I don't know if the Court wants to act . . . or if there are any other motions under the circumstances." The court responded: "It ought to be cleaned up, really, once and for all. I just could, maybe, sign the order in favor of —— maybe the easy thing to do is just dismiss the —— I don't know, it ought to be done—we ought to clear it up. Why don't you all present an order and I'll sign the order. Get . . . everybody's name on, and I'll sign it." Consequently, counsel for Byers and counsel for Hollenbach & Honcho each orally "mov[ed] that the case be dismissed . . . under the theory [of] the Court in making its ruling." For the record, appellant opposed their motions for the reasons previously asserted.

---

6. At the hearing, Excalibur's counsel asked the court whether it was treating its motion to dismiss as a motion for summary judgment and the court replied: "I'm treating your motion for summary judgment as a motion for summary judgment. . . . And the motion to dismiss is denied, so I didn't even think about it." Later, the court added: "Procedurally, it doesn't matter . . . whether you call it . . . motion to dismiss . . . or summary judgment, it's the same analysis."

Thereafter, the court entered summary judgment in favor of appellees.

## Discussion

In reviewing a trial court's decision to grant a motion for summary judgment, we evaluate "the same material from the record and decide[ ] the same legal issues as the circuit court." *Lopata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied,* 351 Md. 286, 718 A.2d 234 (1998). We must determine if there is a genuine dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *See Murphy v. Merzbacher,* 346 Md. 525, 531, 697 A.2d 861 (1997); *Bowen v. Smith,* 342 Md. 449, 454, 677 A.2d 81 (1996); *Rosenblatt v. Exxon Company, U.S.A.,* 335 Md. 58, 68, 642 A.2d 180 (1994); *Lombardi v. Montgomery County,* 108 Md.App. 695, 710, 673 A.2d 762 (1996); *see also Chicago Title Ins. Co. v. Lumbermen's Mut. Cas. Co.,* 120 Md.App. 538, 546, 707 A.2d 913 (1998); *Bagwell v. Peninsula Regional Medical Ctr.,* 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996); Md. Rule 2-501(e). "A material fact is one that 'will alter the outcome of the case depending upon how the factfinder resolves the dispute over it.'" *Chicago Title Ins. Co.,* 120 Md.App. at 547, 707 A.2d 913 (quoting *Bagwell,* 106 Md.App. at 489, 665 A.2d 297); *see also King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985).

To be sufficient to generate a dispute, the evidence adduced by the non-moving party must be more than "mere general allegations which do not show facts in detail and with precision." *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 738, 625 A.2d 1005 (1993). Moreover, in determining whether there is a genuine dispute of material fact, the trial court must view the facts in the light most favorable to the non-moving party and construe all inferences reasonably drawn therefrom in favor of that party. *See id.* at 739, 625 A.2d 1005; *Himelfarb v. Hartford Fire Ins. Co.,* 123 Md.App. 456, 462, 718 A.2d 693, *cert. granted,* 352 Md. 398, 722 A.2d 885 (1999); *Chicago Title Ins. Co.,* 120 Md.App. at 547, 707 A.2d 913. Indeed,

' " 'even where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact.' " ' *King,* 303 Md. at 111, 492 A.2d 608 (quoting *Porter v. General Boiler Casing Co.,* 284 Md. 402, 413, 396 A.2d 1090 (1979)(quoting *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256 (1970)).

▇▇▇ If we determine that no genuine issue of material fact is present, then we must decide "whether the [trial] court reached the correct legal result." *Chicago Title Ins. Co.,* 120 Md.App. at 547, 707 A.2d 913; *see Rosenblatt,* 335 Md. at 69, 642 A.2d 180; *Beatty,* 330 Md. at 737, 625 A.2d 1005; *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990); *Himelfarb,* 123 Md.App. at 463, 718 A.2d 693. Moreover, we ordinarily review the grant of summary judgment based "only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *see Gross v. Sussex Inc.,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Chicago Title Ins. Co.,* 120 Md.App. at 547, 707 A.2d 913; *Hoffman v. United Iron and Metal Co., Inc.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

With these principles in mind, we turn to examine the principles of law that govern our resolution of this case.

Central to appellant's claim is his view that the court erred because it applied the doctrine of primary assumption of risk. He also contends that the court erred in applying the Fireman's Rule, because appellant was merely a civilian employee of Washington Gas. With respect to the Fireman's Rule, appellant admittedly engaged in a dangerous line of work that clearly affects public safety. But, he argues that he is not a professional rescuer, or a public employee, and he claims that a gas man's relationship to the public is not equal to that of a fireman or policeman. Moreover, he asserts that the Fireman's Rule is premised on unique and important public policy considerations that are not implicated here. Further, Crews complains that the court failed to consider several important

issues, not yet explored, including: "[C]ould Mr. Crews have refused to attempt to dissipate the gas leak?"; "Did [appellant] apprehend the particular danger posed by a leak that had been leaking for over two hours?"; and "Is this type of leak abnormally dangerous or of a type normally handled by Mr. Crews?".

Appellees seem to focus on the doctrine of primary assumption of risk, rather than the Fireman's Rule. They assert that the injury Crews suffered was "a foreseeable risk inherent to his occupation." In this regard, they note that Crews was called to the scene of the incident for the very purpose for which he was employed, i.e., to repair a gas leak, and he "suffered a well known and foreseeable risk of being a gas repairman—a gas explosion." Further, appellees posit that it is irrelevant whether the particular situation was abnormally dangerous, whether appellant could have refused to attempt to dissipate the leak, or whether appellant knew of or appreciated the particular danger posed by the leak. Instead, appellees contend that the dispositive issue is "whether the hazard or condition [appellant] encountered was a hazard generally recognized as being within the scope of dangers identified in the job."

Alternatively, appellees maintain that appellant's recovery is barred by the "more traditional 'secondary assumption of risk'" doctrine. They contend that appellant knew, appreciated, and voluntarily exposed himself to the specific risk he encountered. Appellant responds that his conduct in attempting to repair the gas leak did not constitute secondary assumption of risk, because he did not "appreciate the specific danger involved in the Bowie gas leak."

Primary assumption of risk is a concept distinct from secondary assumption of risk. A primary assumption of the risk defense generally applies when the defendant lacks any duty to protect the plaintiff from the particular risk, and thus the defendant cannot have breached a duty of care owed to the plaintiff. In contrast, a secondary assumption of risk occurs when a plaintiff voluntarily chooses to encounter a particular

risk created by the defendant. In *Schroyer v. McNeal,* 323 Md. 275, 284, 592 A.2d 1119 (1991), the Court of Appeals acknowledged: "Although the definition of assumption of risk is well settled in Maryland, ... [the] application of the defense—determining when and how to apply it—is yet rather difficult."

In W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 480 (5 th ed.1984)(hereinafter, *Prosser and Keeton* ), the authors posit that the doctrine of assumption of risk has been used in "several different senses, which traditionally have been lumped together under one name, often without realizing that any difference exists." *See also Schroyer,* 323 Md. at 284, 592 A.2d 1119 (citing Restatement (Second) of Torts § 496A, comment c, at 561). Prosser and Keeton articulate three different "senses" of assumption of risk: "the express consent perspective"; "the misconduct defense perspective"; and "the duty perspective." *Prosser and Keeton,* § 68 at 480–81.

The express consent perspective applies when a plaintiff, in advance, gives "express consent to relieve the defendant of an obligation toward him, and to take his chance of injury from a known risk arising from what the defendant is to do or leave undone." *Id.* at 480. The concept of the misconduct defense applies when a plaintiff "is aware of a risk that has already been created by the negligence of the defendant, yet chooses voluntarily to proceed to encounter it...." *Id.* at 481. The duty perspective, commonly referred to as "primary assumption of risk," occurs when

> the plaintiff voluntarily enters into some relationship with the defendant, with the knowledge that the defendant will not protect him against one or more future risks that may arise from the relation. He may then be regarded as tacitly or *impliedly* consenting to the negligence and agreeing to take his own chances. Thus, he may accept employment, knowing that he is expected to work with a dangerous horse; or ride in a car with knowledge that the brakes are defective, or the driver incompetent.... [T]he legal result

**628**

is that the defendant is simply relieved of the duty which would otherwise exist.

*Prosser and Keeton* at 481.

In *Flowers v. Sting Security, Inc.,* 62 Md.App. 116, 135, 488 A.2d 523 (1985), *aff'd,* 308 Md. 432, 520 A.2d 361 (1987), the Court of Special Appeals quoted 2 F. Harper & F. James, *The Law of Torts* (1956) § 21.1 at 1162, to explain the different kinds of assumption of the risk:

> The term assumption of risk has led to no little confusion because it is used to refer to at least two different concepts, which largely overlap, have a common cultural background, and often produce the same legal result. But these concepts are quite distinct rules involving slightly different policies and different conditions for their application. (1) *In its primary sense the plaintiff's assumption of risk is only the counterpart of the defendant's lack of duty to protect the plaintiff from that risk.* In such case plaintiff may not recover for his injuries even though he was quite reasonable in encountering the risk that caused it. Volenti non fit injuria. (2) *A plaintiff may also be said to assume a risk created by a defendant's breach of duty towards him, when he deliberately chooses to encounter that risk.* Hereafter *we shall call this* 'assumption of risk in secondary sense.'

(Footnotes omitted and emphasis added in *Flowers* ).

The elements of the affirmative defense of secondary assumption of the risk are quite familiar. The defendant must establish that: (1) the plaintiff had knowledge of the risk of danger; (2) the plaintiff appreciated that risk; and (3) the plaintiff voluntarily encountered the risk of danger. *ADM Partnership v. Martin,* 348 Md. 84, 90–91, 702 A.2d 730 (1997); *see Neal v. Prince George's County,* 117 Md.App. 460, 466, 700 A.2d 838, *vacated on other grounds,* 348 Md. 329, 703 A.2d 656 (1997), *cert. denied after remand,* 350 Md. 277, 711 A.2d 869 (1998); *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 630, 495 A.2d 838 (1985). Ordinarily, it is for the jury to determine whether a plaintiff knew of the danger and appreciated the risk. *Prosser and Keeton* § 68 at 487. "On the other hand,

when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue [concerning knowledge and appreciation of the danger] is for the court." *Schroyer v. McNeal,* 323 Md. at 283–84, 592 A.2d 1119 (citations omitted).

In *Tucker v. Charles Shoemake d/b/a Rio Vista Plaza,* 354 Md. 413, 731 A.2d 884 (1999), the Court of Appeals made clear that the Fireman's Rule is a "public-policy grounded doctrine," at 419, 731 A.2d 884, founded on the special relationship between public safety officers and the public. Consequently, the Fireman's Rule ordinarily precludes recovery by a fireman or a policeman from private parties, in tort, for injuries sustained in the course of executing professional duties. In *Flowers v. Rock Creek Terrace Ltd. Partnership,* 308 Md. 432, 447–48, 520 A.2d 361 (1987), the Court explained:

> [A]s a matter of public policy, firemen and police officers generally cannot recover for injuries attributable to the negligence that requires their assistance. This public policy is based on a relationship between firemen and policemen and the public that calls on these safety officers specifically to confront certain hazards on behalf of the public. A fireman or police officer may not recover if injured by the negligently created risk that was the very reason for his presence on the scene in his occupational capacity. Someone who negligently creates the need for a public safety officer will not be liable to a fireman or policeman for injuries caused by this negligence.

Appellant asserts that the lower court erred because it applied the primary assumption of risk doctrine. Yet, he also contends that the court erred by applying the Fireman's Rule. As we see it, the trial court applied the doctrine of primary assumption of risk, not the Firemen's Rule. Moreover, it appears to us that appellant conflates the related principles of primary assumption of risk and the Fireman's Rule; he discusses the concepts interchangeably, as if they are one and the same.

In our view, the Fireman's Rule, seems to constitute a species of primary assumption of risk. Although the two doctrines share important similarities, they are primarily distinguished by the public policy factor that undergirds the Fireman's Rule. A review of *Flowers* underscores the distinction.

In *Flowers, supra,* 308 Md. 432, 520 A.2d 361, a fireman was injured "when he fell twelve stories down an open elevator shaft while responding to a fire in an apartment building." *Id.* at 436, 520 A.2d 361. Thereafter, he sued the building owners, the security guard company, and the elevator manufacturer, claiming a general "failure to maintain the property in a safe condition." *Id.* The Court concluded that, "as a matter of public policy," *id.* at 447, 520 A.2d 361, the suit was precluded by the Fireman's Rule, because the owner of the premises had no duty to keep the property safe for a fireman. Writing for the Court, Judge Eldridge said: "[I]t is an analysis of the relationship between firemen and the public whom they serve which best explains the fireman's rule." *Id.* at 444, 520 A.2d 361.

Recognizing the public policy factor as a key component of its decision, the *Flowers* Court observed that, unlike firemen and policemen, other public employees, such as postal workers, are generally entitled to due care. *Id.* In contrast, "[f]iremen are engaged by the public to encounter risks inherent in firefighting; they assume those risks, and therefore they should not recover for fire-related injures." *Id.* at 445, 520 A.2d 361. Moreover, in the Court's view, "an accident involving an open elevator shaft . . . is within the range of the anticipated risks of firefighting." *Id.* at 451, 520 A.2d 361.

In its analysis, the *Flowers* Court referred to the "somewhat analogous . . . assumption of risk doctrine applied in negligence cases." *Id.* at 445, 520 A.2d 361. In that regard, the Court quoted from *Krauth v. Geller,* 31 N.J. 270, 157 A.2d 129 (N.J.1960), the seminal case discussing assumption of the risk as a rationale for the fireman's rule:

"The rationale of the prevailing rule is sometimes stated in terms of 'assumption of risk,' used doubtless in the so-called 'primary' sense of the term and meaning that the defendant did not breach a duty owed, rather than that the fireman was guilty of contributory fault in responding to his public duty.... Stated affirmatively, what is meant is that it is the fireman's business to deal with that very hazard and hence, perhaps by analogy to the contractor engaged as an expert to remedy dangerous situations, he cannot complain of negligence in the creation of the very occasion for his engagement. In terms of duty, it may be said there is none owed the fireman to exercise care so as not to require the special services for which he is trained and paid...."

*Flowers*, 308 Md. at 445–46, 520 A.2d 361 (quoting *Krauth*, 157 A.2d at 130–31) (internal citations omitted).

Several other Maryland cases have recognized the concept of primary assumption of risk with regard to employees generally. *See, e.g., Schroyer*, 323 Md. at 284 n. 5, 592 A.2d 1119 (observing that the Second Restatement of Torts identifies four "senses" of the doctrine of assumption of risk); *Flowers*, 308 Md. at 445, 520 A.2d 361; *Baltimore County v. State, Use of Keenan*, 232 Md. 350, 360–62, 193 A.2d 30 (articulating the differences between assumption of risk and contributory negligence and noting that commentators have classified the doctrine of assumption of risk into several types); *Miller v. Michalek*, 13 Md.App. 16, 25, 281 A.2d 117 (1971) (finding that there was "no assumption of risk by [the plaintiff] ... in the primary sense, by express agreement"). Moreover, in cases from other jurisdictions, employees have been found to have assumed certain risks, in the primary sense, by virtue of their professions or occupations, notwithstanding the absence of public policy considerations.

*Bull S.S. Lines v. Fisher, Use of Himself and Globe Indem. Co.*, 196 Md. 519, 77 A.2d 142 (1950), is particularly useful in our analysis. There, the Court considered whether a "ship ceiling carpenter," who was injured when a load of lumber attached to the ship's boom swung toward him and hit him in the chest, could recover for his injuries. *Id.* at 522–23, 77

A.2d 142. The defendant argued that the carpenter was barred from recovery because he was an experienced water-front worker, "thoroughly familiar with the nature of the operation, that he took the chance of the risks incident to it, [and] that the winchman was thereby relieved from any duty toward him...." *Id.* at 526, 77 A.2d 142. Although the parties did not couch their arguments in terms of primary versus secondary assumption of risk, the Court seemed to apply the doctrine in its primary sense. In distinguishing assumption of risk from contributory negligence, the Court noted:

> Assumption of risk has a different basis and affects not the negligence of the plaintiff, but the degree of care which the defendant has to exercise under the circumstances.... "In its primary and proper sense, it means that the plaintiff has consented to relieve the defendant of an obligation of conduct toward him, and to take his chance of injury from a known risk.... He makes the choice at his own risk, and is taken to consent that the defendant shall be relieved of responsibility. The legal position is then that the defendant is under no duty to protect the plaintiff. It is not a question of any negligence on the part of the plaintiff, who may be acting quite reasonably, and it is immaterial whether he has exercised proper caution."

*Id.* at 524, 77 A.2d 142 (internal citation omitted).

The Court determined that the "answer to ... [the] question [of whether the carpenter assumed the risk] depend[ed] largely upon what risk the appellee assumed...." *Id.* at 526, 77 A.2d 142. The Court observed that one in a dangerous position " 'might be held bound to anticipate and so assume dangers from operation in ordinary course, yet not to anticipate and assume the risk of rare casualties.' " *Id.* at 527, 77 A.2d 142 (citation omitted). Because it was not clear that the risk of being hit by the boom was a risk inherent in working as a ship's ceiling carpenter, the Court concluded that "the issue of what risk was assumed by the ... [carpenter] was properly left to the jury." *Id.* at 527, 77 A.2d 142. The Court explained:

[E]very risk is not necessarily assumed by one who works in a dangerous place or at a dangerous occupation. He assumes only those risks which might reasonably be expected to exist, and, if by some action of the defendant, an unusual danger arises, that is not so assumed. Where there is a dispute whether the risk is assumed or not, that question should be left to the jury.

*Id.* at 526, 77 A.2d 142.

*Maltman v. Sauer,* 84 Wash.2d 975, 530 P.2d 254 (1975), also provides guidance. There, members of an Army helicopter crew were killed when their helicopter crashed en route to the scene of an automobile accident. Their estates were denied recovery in a suit lodged against the accident victim. The Supreme Court of Washington recognized: "Those dangers which are inherent in professional rescue activity, and therefore foreseeable, are willingly submitted to by the professional rescuer when he accepts the position and the remuneration inextricably connected therewith." *Id.* at 257 (citation omitted). It concluded:

[T]he proper test for determining a professional rescuer's right to recovery under the "rescue doctrine" is whether the *hazard ultimately responsible for causing the injury is inherently within the ambit of those dangers which are unique to and generally associated with the particular rescue activity.* Stated affirmatively, it is the business of professional rescuers to deal with certain hazards, and *such an individual cannot complain of the negligence which created the actual necessity for exposure to those hazards.* When the injury is the result of a hazard generally recognized as being within the scope of dangers identified with the particular rescue operation, the doctrine will be unavailable to that plaintiff.

*Id.* (Emphasis added). Applying that standard to the facts in issue, the Washington Supreme Court stated:

A danger unique to helicopter rescues is the possibility of a mechanical malfunction in the airplane or pilot error, either of which could cause a crash. Therefore, a helicopter crew

is specially trained to meet those known hazards. They are hazards within the ambit of those dangers unique to and generally associated with this particular rescue operation.... [T]hese hazards are not hidden, unknown, and extra hazardous dangers which would not be reasonably anticipated or foreseen by the decedent professional rescuers.

*Id.* at 258.

*Dyer v. Superior Court (Hasou),* 56 Cal.App.4th 61, 65 Cal.Rptr.2d 85 (1997), is also noteworthy. That case involved a tow truck operator who was injured while attending to a disabled vehicle located off the freeway. The California appellate court held that the operator could not recover from the driver of the disabled vehicle because, under the primary assumption of risk doctrine, the driver owed no duty of care to the operator "to maintain his car in running order." *Id.* at 92. The court stated: "In our view, it is good social policy to encourage motorists ... to rely on the contractual arrangements for aid from private towing services, rather than to discourage them by imposing upon them a potential liability for asking for help." *Id. See also, e.g., Peters v. Titan Navigation Co.,* 857 F.2d 1342, 1345 (9 th Cir.1988) (affirming summary judgment for a shipowner regarding claims brought by a hydraulic system repairman injured by slipping on spilled hydraulic fluid, because "there is no negligence liability when a repairman is injured by the very condition he is hired to repair"); *Rosenbloom ·v. Hanour Corp.,* 66 Cal.App.4th 1477, 78 Cal.Rptr.2d 686, 688 (1998) (concluding that because shark bites are an occupational hazard of shark handling, under the primary assumption of risk doctrine "no duty is owed to protect the shark handler from the very danger that he or she was employed to confront"); *Herrle v. Estate of Marshall,* 45 Cal.App.4th 1761, 53 Cal.Rptr.2d 713 (1996)(stating that certified nurses aide in convalescent home for mentally incompetent patients may not recover from injuries caused by one of the patients); *Bryant v. Glastetter,* 32 Cal.App.4th 770, 38 Cal.Rptr.2d 291 (1995) (concluding that tow truck operator could not recover from drunk driver when he was struck and

killed by another car while working to haul away the drunk driver's car); *Cohen v. McIntyre,* 16 Cal.App.4th 650, 20 Cal.Rptr.2d 143, 146 (1993) (finding veterinarian barred from recovering for bite because the injury occurred during an "activity for which he was employed and compensated and one in which the risk of being ... bitten is well known"); *Nelson v. Hall,* 165 Cal.App.3d 709, 211 Cal.Rptr. 668 (1985) (finding veterinarian assistant who was bitten by a dog was barred from recovery under the doctrine of primary assumption of risk).

We recognize that there may be circumstances when the doctrine of primary assumption of risk would not apply to a person employed to repair a gas leak, who is injured in the course of doing so. Similarly, in *Flowers,* this Court recognized an exception to the application of the Fireman's Rule, stating:

> The animating principle is that even under the assumption of risk rationale for the [Fireman's] Rule, a fireman does not assume *all* risks to which he may be exposed in the course of fighting a fire, but "assumes *only* those *hazards* which are *known or can reasonably be anticipated* at the site of the fire...."

*Flowers,* 62 Md.App. at 136–37, n. 10, 488 A.2d 523 (citation omitted). Later, in its *Flowers* decision, the Court of Appeals also acknowledged that even "firemen and policemen are not barred from recovery for all improper conduct." *Flowers,* 308 Md. at 448, 520 A.2d 361. Indeed, the Court recognized: "The owner or occupant of the premises must ... abstain from willful or wanton misconduct or entrapment. This encompasses a duty to warn of hidden dangers, where there was knowledge of such danger and an opportunity to warn." *Id.* at 443, 520 A.2d 361. The Court added: "[I]n some circumstances, when a fireman is outside of the anticipated occupational risk of fighting a fire he may be entitled to ordinary due care." *Id.*

The Court's recent decision in *Tucker, supra,* also recognizes that the Fireman's Rule does not necessarily bar recov-

ery for negligence when a public safety worker is injured when responding to an emergency. There, the Court concluded that the Fireman's Rule did not bar a police officer's recovery for injuries he sustained when he stepped on a manhole cover and fell into an underground valve compartment while responding to a domestic dispute at a privately owned trailer park community. The Court reasoned that the Fireman's Rule did not preclude recovery, because the officer was not injured by the "risk that occasioned his presence at the trailer park." At 419, 731 A.2d 884. The Court further stated: "[T]he negligence alleged to have caused Officer Tucker's injuries was independent and not related to the situation requiring his services as a police officer." *Id.*

Unlike in *Tucker,* appellant's injuries were clearly related to the situation requiring his services as a gas man. Indeed, his injury resulted from the gas leak he was called upon to repair. *Cf. Tucker,* at 421, 731 A.2d 884 (observing that if the officer had "suffered some injury due to a negligent condition in the trailer where the domestic dispute was or had been in progress, the Fireman's Rule likely would apply").

Appellant complains that there are issues relevant to whether he primarily assumed the risk, which the trial court did not consider and that the record did not address, such as the nature of the risk, whether appellant had a choice to respond to the scene, and whether appellant knew that the gas had been leaking for some two hours when he arrived at the scene. It is clear to us that these matters, including the apparent delay of some two hours in reporting the gas leak, do not defeat the application of the doctrine of primary assumption of risk.

There is no basis to conclude that a gas company is always promptly advised about a possible gas leak. Indeed, it seems just as likely that a gas company would not immediately learn about a gas leak, for any number of reasons. To illustrate, a line could develop a leak in the middle of the night, and no one might realize it until hours later. Or, a citizen might be unsure of the nature of an odor, particular one that he or she

encounters outside, and thus may fail to take prompt precautionary measures. When a gas leak repairman accepts a position with the gas company, he does not assume only those risks associated with the least dangerous gas leak, or one that is reported within minutes of the occurrence. Rather, he assumes the dangers associated with gas leaks generally. To be sure, the risk from a gas leak of some two hours in duration should have been as readily anticipated by a gas leak repairman as the open elevator shaft was to the fireman in *Flowers*.

The facts in our recent case of *Boddie v. Scott*, 124 Md.App. 375, 722 A.2d 407 (1999), stand in marked contrast to this matter. That case presented a situation of an injury to an electrical repairman that resulted from events well beyond what reasonably might have occurred in his line of work as an electrician. Accordingly, we upheld the jury verdict in favor of the electrician.

In *Boddie*, the electrician was severely injured while trying to assist a homeowner with a kitchen fire negligently caused when the homeowner left oil cooking on the stove. *Boddie*, 124 Md.App. at 378, 722 A.2d 407. Upon discovering the fire, the homeowner screamed for the electrician, who was repairing a defective outlet, saying: " '[P]lease, sir, come help me, my house is on fire.' " *Id.* The electrician ran to the kitchen and observed flames " 'towering all the way up to the ceiling.' " *Id.* As the homeowner stood " 'scared' " and silent, *id.*, the electrician wrapped newspaper around the handle of the pan, walked "briskly towards the front door," *id.*, and then "hurled the flaming pan" outside. *Id.* In the process, the electrician was severely injured. *Id.* at 379, 722 A.2d 407.

In the electrician's suit against the homeowner for negligence, the homeowner defended based on assumption of risk. Although the electrician had knowledge of and appreciated the risk, we concluded that he did not voluntarily assume the risk of injury when he decided to remove the flaming pan from the customer's home. *Id.* at 388–89, 722 A.2d 407. We reasoned that when a person is faced with either: (1) disposing of a fire,

thereby protecting the home and its contents, or (2) ushering the inhabitants out of the house and letting the fire rage, that person does not really have a choice, because the latter is not a "'viable alternative.'" *Id.* at 387, 722 A.2d 407 (quoting *VanCollom v. Johnson,* 228 Va. 103, 319 S.E.2d 745, 747 (Va.1984)). Because the homeowner failed to show that the electrician met the three pronged test set out in *ADM Partnership v. Martin, supra,* the defense of assumption of risk was not available to her.

Unlike Crews, the electrician in *Boddie* clearly was not injured by a work-related condition or situation within the scope of his employment. Rather, he was injured because he happened to be in a home when fire broke out, and he tried to protect the homeowner and her home from the spread of an oil fire. Clearly, an injury from a fire caused by careless cooking is not a risk associated with working as an electrician.

In contrast, the risk of an explosion from a gas leak is precisely within the scope of dangers intrinsic to the occupation of a gas leak repairman, much like a helicopter crash for a helicopter rescue team, an animal bite for a veterinarian, or a fireman's fall down an elevator shaft. As appellant acknowledged in his deposition, "any type of gas leak or odor is always dangerous," because a fire could always "start behind natural gas." Thus, unlike the ship's carpenter in *Bull S.S. Lines* or the electrician in *Boddie,* appellant had reason to anticipate the danger. Indeed, Crews admitted that when working on a volatile natural gas leak "anything can set it off, gravels [sic] or rocks that hit together, hitting metal."

 Crews "accept[ed] that responsibility when . . . [he] first got hired." Clearly, there was a direct causal relationship between the performance of appellant's duties as a gas leak repairman and the cause of his injury. Because appellant knew that his occupation carried with it certain risks, he may not now be heard to complain when one of those job-related foreseeable risks materialized. Under such circumstances, we agree with the trial court that appellant was barred from recovery.

In sum, there were no genuine disputes as to material facts. To the contrary, the undisputed facts in the record, most notably those from appellant's deposition, are susceptible of only one inference: appellant accepted his responsibility as a gas leak repairman to fix leaks in the face of dangers, including fire and explosion. Thus, by virtue of his employment, appellant is deemed to have assumed all reasonably anticipated risks inherent in dealing with such gas leaks. Because we conclude that the trial court properly granted appellees' motion for summary judgment on the ground that appellant primarily assumed the risk by virtue of his occupation, we need not reach appellees' alternative contention that appellant was barred from recovery under a secondary assumption of risk theory.

**JUDGMENT AFFIRMED; APPELLANT TO PAY COSTS.**